The LINCOLN NATIONAL LIFE INSUR-
ANCE COMPANY, an Indiana Corpora-
tion, in its individual capacity and as
assignee of the Santa Fe Private Equity
Fund II, L.P., a New Mexico limited
partnership, Plaintiff,

v.

A. David SILVER, and ADS Partners,
L.P., a New Mexico limited
partnership, Defendants.

No. 86 C 7175.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 29, 1995.

Michael J. Koenigsknecht, Gardner, Carton & Douglas, Chicago, IL, for plaintiff.

A. David Silver, Santa Fe, NM, pro se.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

### I. INTRODUCTION

This dispute regarding Defendant A. David Silver's alleged mismanagement of two venture capital funds came before the Court for bench trial on August 16–20, 23–27, and September 30, 1993. The Court heard closing arguments on October 22, 1993. The parties have each submitted a memorandum of proposed findings of fact and conclusions of law. In addition, the parties have briefed to the Court the Defendants' Motion for a Directed Verdict. After first summarizing the case and then deciding several outstanding motions, the Court makes its findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

#### A. Jurisdiction

The Court has jurisdiction over this action under Section 1331 of the Judicial Code, 28 U.S.C. § 1331, Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v, Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, Section 1965 of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965, and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

#### B. Case Summary

This case arises out of Defendant Silver's improper management of two venture capital funds, the Santa Fe Private Equity Fund ("SFPEF I") and the Sante Fe Private Equity Fund II ("SFPEF II"), each of which were limited partnerships run by a venture capital fund controlled by Silver, ADS Associates, Ltd. ("ADSA"), which controlled SFPEF I, and ADS Partners, Ltd. ("ADSP"), which controlled SFPEF II. SFPEF I was predominantly a computer industry fund. Its portfolio companies included Pathfinder Computer Centers ("Pathfinder"), Avant–Garde, which later merged with Family Achievement Software Company ("FASCO"), and Cipherlink Corporation ("Cipherlink"). Each of these three companies experienced severe cash problems and were on the verge of failing when Silver organized SFPEF II, which he touted as a health care

fund. Plaintiff, the Lincoln National Life Insurance Company ("Lincoln"), was among SFPEF II's limited partners.

Although SFPEF II was supposed to be a health care fund, and despite the fact that several of that fund's limited partners had declined to invest in SFPEF I, Silver invested more than seventy percent of the SFPEF II's first capital call in computer companies that were part of SFPEF I's portfolio, including the failing Pathfinder, Avant–Garde/FASCO, and Cipherlink. When the SFPEF II limited partners learned of the nature of the fund's investments, they requested Silver to refrain from continuing to invest in SFPEF I portfolio companies. He nevertheless persisted. The limited partners of the two funds removed Silver's management companies as their general partners on February 10, 1987 and had a receiver appointed for the Funds. In April 1988, the receiver for SFPEF II assigned to Lincoln all of SFPEF II's claims in this case.

Lincoln's Second Amended Complaint, the pleading on which this action is now based, contains twenty-three counts which make claims against several individuals and entities, all of which save Silver and ADS Partners, Ltd. ("ADSP"), the managing general partner of SFPEF II, have been dismissed from this case. The following Counts were tried to the Court.

In Counts VIII, IX and X, Lincoln, in its individual capacity, claims that Silver violated sections 1962(a), 1962(b), and 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Pub.L. 91–452, Title IX, § 901(a), 84 Stat. 941 (1970) (codified as amended at 18 U.S.C. §§ 1961–1968 (1988)).

In Counts XI, XII, and XIII, Lincoln repeats its RICO claims as assignee of SFPEF II, claiming that Silver violated 18 U.S.C. §§ 1962(a), 1962(b), 1962(c).

In Counts VI and VII respectively, Lincoln individually and as SFPEF II's assignee claims that Silver and ADSP breached fiduciary duties owed under N.M. Stat. Ann. §§ 54–2–9 and 54–1–21(A) (1978).

In Count III, Lincoln, individually, claims that Silver and ADSP violated section 10(b) of the Securities Exchange Act of 1934, ch. 404, 48 Stat. 881 (1934) (codified as amended in scattered sections of 15 U.S.C. (1988)).

In Count I, Lincoln, individually, claims that Silver and ADSP violated section 12(2) of the Securities Act of 1933, ch. 38, 48 Stat. 74 (1993) (codified as amended in scattered sections of 15 U.S.C. (1988)).

In Count IV, Lincoln, individually, claims that Silver and ADSP violated section 5/12 of the Illinois Securities Law of 1953 (codified as amended at S.H.A. 815 ILCS 5/1–19 (1993)).

In Count XXI, Lincoln, individually, claims that Silver engaged in common law fraud.

### C. Defendants' Motion for a Directed Verdict

At the close of the Plaintiff's case, the Defendants moved for a directed verdict. The motion is denied, for the reasons indicated in the Court's findings of fact and conclusions of law.

### D. Silver's Motion to Reopen the Evidence

Silver moves, pursuant to Rules 59 and 60 of the Federal Rules of Civil Procedure, to reopen the evidence in this case so that the Court may consider a Pledge Agreement which is already, in fact, in evidence. The motion is denied. The proffered evidence is already part of the record. In addition, Silver's arguments accusing witness William Enloe and Plaintiff's counsel of wrongdoing are hereby ordered stricken.

### E. The Parties' Motions for Sanctions

The parties have each requested sanctions against the other. These requests are denied.

### F. Summary of the Court's Findings

Both parties were well represented at trial. Lincoln had the services of very capable counsel who represented their client in a thorough and professional way. Silver, a non-lawyer, represented himself *pro se*. He demonstrated remarkable skill in capably representing himself, with the assistance of his wife, despite the fact that, as the Court's findings of fact show, he had a weak case.

At trial, the Court heard testimony from A. David Silver, Ivan Berk, Steven Rork,

Verne Spangenberg, Kyle Lefkoff, Richard Azimov, Eric Lesin, Thomas Measday, William Byrne, and Richard Dumler. In addition, the parties submitted portions of the deposition testimony of Silver, Jesse Acker (taken on two different occasions), James Ray, W. Hardee Mills, Gary Stoefen, Phillip DeWald, and William Enloe. The Court has reviewed the memoranda and arguments of counsel, the testimony of the witnesses, the depositions of absent witnesses, the exhibits and stipulations received into evidence, the trial transcript, and detailed notes taken by the Court at trial. In listening to the testimony at trial, the Court took care to appraise each witness's credibility and to determine the weight to be accorded the witness's testimony. In so doing, the Court considered the witnesses' intelligence, ability, and opportunity to observe; their age, memory and manner while testifying; any interest, bias, or prejudice they may have had; and the reasonableness of their testimony in light of all the evidence presented in the case. The Court recorded its impressions of the witnesses in its notes.

In reaching its conclusion in this case, the Court has sought to draw reasonable inferences from the evidence, and has considered the parties' legal arguments. In the opinion of the Court, the evidence submitted at trial requires judgment for Plaintiff. The Court now makes its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## II. FINDINGS OF FACT

### A. The Parties

The Lincoln National Corporation is the parent company of the Plaintiff in this case, The Lincoln National Life Insurance Company ("Lincoln"), and of Lincoln National Investment Management Company ("LNIMC"), which acted as Lincoln's agent through its then Vice President, Ivan Berk. Lincoln is an Indiana Corporation having its principal place of business in Fort Wayne, Indiana.

Defendant A. David Silver ("Silver") is a venture capitalist who managed SFPEF I and SFPEF II through two limited partnerships formed under New Mexico law, ADS

Associates, L.P. ("ADSA"), which was the managing general partner of SFPEF I, and ADS Partners, L.P. ("ADSP"), which was the managing general partner of SFPEF II. Silver resides in New Mexico. At all relevant times, the principal place of business for Silver, ADSA, ADSP, SFPEF I, and SFPEF II was 524 Camino del Monte Sol, Santa Fe, New Mexico.

SFPEF I, or "Fund I", was organized as a limited partnership pursuant to the laws of the State of New Mexico in August of 1983. ADSA was SFPEF I's sole general partner until February 10, 1987, when it was removed by the limited partners. SFPEF II, or "Fund II", was organized as a limited partnership pursuant to the laws of the State of New Mexico in August of 1985. ADSP was the sole general partner of SFPEF II until February 10, 1987, when it was removed by the limited partners.

In February 1987, after ADSA and ADSP were removed as general partners, the First Judicial District Court for the County of Santa Fe, New Mexico appointed John Clark ("Clark") to serve as the receiver for both funds.

Lincoln filed this suit in September 1986 against Silver, ADSP, and other Defendants who have since been dismissed. Thereafter, several of the Silver-related entities went into bankruptcy.

In May 1987, Clark filed for SFPEF I a bankruptcy petition pursuant to Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Mexico. In February 1988, ADSA and ADSP filed bankruptcy petitions pursuant to Chapter 7 of the Bankruptcy Code for SFPEF I in the United States Bankruptcy Court for the District of New Mexico. Silver has himself filed for bankruptcy protection as well.

In April 1988, Clark, for SFPEF II, assigned to Lincoln all of SFPEF II's claims against Silver and ADSP as part of a settlement of claims against SFPEF II. (Stipulation of Facts ¶ 11; Tr. at 821–22.) On April 21, 1988, the First Judicial District Court for the County of Santa Fe, New Mexico entered an order approving the assignment.

## B. SFPEF I

In August, 1983, Silver, as managing partner of ADSA, formed SFPEF I for the purpose of investing in and providing venture capital to computer and other high-technology companies.

As of December 31, 1984, Silver had invested approximately $10.5 million of SFPEF I's capital in eleven portfolio companies. The portfolio consisted of: Pathfinder Computer Centers ("Pathfinder"), Avant–Garde Publishing Corp. ("Avant–Garde"), which later merged with Family Achievement Software Company ("FASCO"), Cipherlink Corporation ("Cipherlink"), Gateway Computer ("Gateway"), Personal Diagnostics, Inc., Critichem, Mesa Diagnostics, Inc., Sonostics, NMR Imaging, Inc. ("NMR"), and Central Data Corporation. Of the $10.5 million invested, more than $4.7 million was invested in Pathfinder, Fund I's largest investment, and Avant–Garde. (Stipulation of Facts ¶ 15.)[1] Silver's investments in Cipherlink and Gateway are also particularly relevant to this lawsuit.

Pathfinder, a chain of retail stores which sold computer hardware and software to small and medium sized businesses, had been founded as a limited partnership in 1982 and was incorporated as a privately held Delaware Corporation on July 28, 1983. Silver was one of the company's founders, was the Chairman of its Board of Directors, and its Chief Executive Officer. (*See* Tr. at 56; Silver Dep. at 337–38; Pl.'s Ex. 20 at 20.) The company hired Steven A. Rork ("Rork") as President. He worked in that capacity from 1982 until April 1985, when he was demoted and later dismissed by Silver. (Tr. at 53–56, 74–75; Pl.'s Ex. 19 at 24.) Rork, Silver, and SFPEF I were Pathfinder's principal stockholders when it was incorporated. (Tr. at 54–55.)

The Court finds that SFPEF I invested extensively in Pathfinder. As of December 31, 1984, SFPEF I had invested $3,003,396 in Pathfinder. (Pl.'s Ex. 2 at 2.) In the following year, between January 1, 1985 and July 31, 1985, SFPEF I invested another $1.6 million, making SFPEF I Pathfinder's single largest investor. (Stipulation of Facts ¶ 22.)

Avant–Garde was an Oregon corporation, incorporated in 1983, that designed and marketed software for the home personal computer market. (Stipulation of Facts ¶ 25.) In January 1985, SFPEF I established Family Achievement Software Corporation ("FASCO"), which acquired 80 percent of Avant–Garde's stock. (Stipulation of Facts ¶ 27.) Silver was FASCO's Chairman of the Board. (Tr. at 815–16; Silver Dep. at 338; Pl.'s Ex. 297 at 9.) The two companies merged in November of 1985. (Stipulation of Facts ¶ 28.)

Silver offered Verne Spangenberg ("Spangenberg") a position with FASCO in early 1985. (Tr. at 354–56.) Spangenberg was President and Chief Operating Officer of FASCO and Vice–President and Treasurer of Avant–Garde.[2] (Tr. at 355; Pl.'s Exs. 259, 260.) Spangenberg planned to sell the viable Avant–Garde products, develop a new line of software products based on celebrity endorsements called "Achieveware", acquire other products and companies, and then take FASCO public. (Tr. at 356.)

The Court finds that Silver, for SFPEF I, invested extensively in Avant–Garde/FASCO. As of December 31, 1984, SFPEF I had invested $1,745,177 in FASCO. (Pl.'s Ex. 2 at 2.)

Cipherlink was incorporated in October 1983. (Pl.'s Ex. 34.) It listed a Los Angeles, California business address. (*Id.*) Silver was one of Cipherlink's directors. (Tr. at 1041.) Eric Lesin was the company's president from its inception until 1986, when it ceased opera-

---

1. The Court notes that the parties had stipulated that Silver had invested $9.2 million in ten companies, omitting Central Data Corporation. Nevertheless, the Statement of Investments contained in SFPEF I's Financial Statements for the year ended December 31, 1984 (Pl.'s Ex. 2), and in SFPEF II's Confidential Memorandum (Pl.'s Ex. 104), shows a total investment figure of $10,-494,538 for a total of eleven portfolio companies.

2. The Court notes that Spangenberg was a particularly credible witness. He had been a Navy pilot for five years (Tr. at 350), and had more than 20 years of business experience (Tr. at 350). He received a mechanical engineering degree from Purdue University and an MBA from Harvard University. (Tr. at 349–50).

tions. (Tr. at 1033.) The company developed a software program to perform data communications between different types of computers. (Tr. at 1033–34.)

The Court finds that SFPEF I invested extensively in Cipherlink. As of December 31, 1984, SFPEF I had invested $1,250,000 in Cipherlink. (Pl.'s Ex. 2 at 2.) One year later, as of December 31, 1985, that investment had risen to $1,747,000. (Pl.'s Exs. 3, 4, 5 at 3.)

Gateway operated a chain of computer systems houses through which it sold, serviced, and installed personal computer systems. (Pl.'s Ex. 6 at 16.) As of December 31, 1984, SFPEF I had invested $1,000,000 in Gateway. (Pl.'s Ex. 2 at 2.) Lincoln invested directly in Gateway as a co-investor with SFPEF I. (Pl.'s Ex. 6 at 16.)

The Court finds that, by the Spring of 1985, when Silver started attempting to form SFPEF II, Pathfinder was operating at a loss and needed cash. (Silver Dep. at 260–63.) So did Avant–Garde, Cipherlink, Gateway, and NMR. (Silver Dep. at 267–68.) However, by June 30, 1985, all of SFPEF I's capital contributions had been paid in. (Stipulation of Facts ¶ 32.) At that time, SFPEF I had only $460,000 in cash in its accounts, (*id.*), and could not meet the cash needs of its portfolio companies.

The Court finds that after June 1985, SFPEF I's ability to invest in and support its portfolio companies had weakened so much that from August 1985 through December 1985, SFPEF I distributed only $452,525, which involved the investment of $396,500 in six portfolio companies, $6900 of which was invested in Pathfinder. (Pl.'s Ex. 299.) Similarly, SFPEF I's disbursements for all of 1986 totaled $25,830 in new investments, with $22,089 for Pathfinder. (Pl.'s Ex. 299.)

### C. The Financial Condition of the SFPEF I Portfolio Companies prior to the formation of SFPEF II

The Court finds that from the last quarter of 1984 until, and through, August of 1985, Pathfinder experienced severe financial problems. Thus, at the time SFPEF II was formed, Pathfinder was on the verge of failing. As of August 1985, Pathfinder was in dire need of cash. The evidence in support of these conclusions was overwhelming. Some of the evidence may be summarized as follows:

1. At the time of its initial public offering ("IPO"), in November 1984, Pathfinder was not generating sufficient revenues to meet its operating expenses, including payroll, payroll taxes, and obligations to key suppliers. (Tr. at 56–57; Pl.'s Ex. 19.) It admitted and disclosed these facts in an S–1 form filed on November 21, 1984 with the Securities and Exchange Commission. (Pl.'s Ex. 19.)

2. IBM and Apple were the two largest lines of computers in 1984 and 1985. Pathfinder was unable to sell either line because of its poor financial condition. (Pl.'s Ex. 19 at 8; Tr. at 108.)

3. The net proceeds from Pathfinder's IPO amounted to $589,000. (Pl.'s Ex. 20 at 16; Tr. at 61.) These funds, when received, relieved Pathfinder's cash-flow problems for two weeks, after which the company returned to its "standard financial crisis." (Tr. at 61.)

4. As of December 31, 1984, as disclosed in Pathfinder's Form 10–K filed with the SEC in March of 1985, Pathfinder's accumulated deficit had grown from $589,-000 to $2,365,000 in one year. Its gross profit decreased from 27.8 percent of sales to 17.6 percent in two years. (*See* Pl.'s Ex. 20 at 3, 14.)

5. Pathfinder's net loss for 1984 was approximately $1,684,000. The previous year's net loss was approximately $382,-000. (Tr. at 61; Pl.'s Ex. 20 at 13.)

6. The accounting firm of Peat, Marwick, Mitchell & Co. ("Peat Marwick") prepared Pathfinder's audited financial statements, which were included in Pathfinder's 1984 10–K. In its Accountant's Report, Peat Marwick stated:

> The magnitude of [certain of Pathfinder's] losses in relation to working capital and stockholders' equity, among other factors, indicate that the Company may be unable to continue in existence.

(Pl.'s Ex. 20 at F.2; Tr. at 67.)

7. Peat Marwick's report issued a "going concern" qualification. (Tr. at 766–67.) A "going concern warning" indicates that the auditors believe that "there is considerable risk that the company could not continue its operations." (Tr. at 654.) Such warnings are not lightly given by auditors because they further jeopardize the company's credit worthiness. (Tr. at 654.)

8. Through March 31, 1985, Pathfinder continued to experience severe cash-flow problems and sustained a net loss of $665,502 over the first three months of 1985. (Pl.'s Ex. 23; Tr. at 68.)

9. Silver was acutely aware of Pathfinder's difficulties. He had received a copy of the firm's 10–K and had been told by Rork that the company's financial future was dismal. (Tr. at 67, 70–71.)

10. Silver told Rork to obtain a $500,000 to $750,000 bridge loan for Pathfinder. (Tr. at 77.) Rork failed to accomplish that mission, even though he contacted approximately 20 financial institutions. (Tr. at 77, 80–82.) Silver also attempted to get bridge financing for Pathfinder. (Tr. at 82; Pl.'s Exs. 110, 224.) Silver represented to Lloyds Bank that he was establishing a second fund from the same investors in SFPEF I and that the fund would be able to guarantee credit to Pathfinder. (Pl.'s Ex. 224.) Despite these representations, Lloyds denied Pathfinder's request for financing, telling Rork that Pathfinder fell "into every risk category there is, and the regulatory authorities such as the FDIC, state examiners, and national bank examiners would be flagged immediately" if Lloyds granted the requested loan. (Tr. at 86; Pl.'s Ex. 228.)

11. For the six months ended June 30, 1985, Pathfinder incurred a net loss of $1,584,199 and saw its accumulated deficit increase to $3,949,581. (Pl.'s Ex. 26.)

12. In a 10–Q Report filed with the SEC, Pathfinder's management indicated that if the company did not secure funding from SFPEF I, it would be unable to get funding from any other source, present-ing "considerable risk as to whether the Company would be able to continue in existence." (Pl.'s Ex. 26.)

13. Silver terminated Rork at the end of August 1985. (Tr. at 86–87.) At the time Pathfinder still had cash-flow problems and had a financial condition described by Rork as "bleak". (Tr. at 87.) Rork believed that his Pathfinder stock was "worthless" (Tr. at 91), but tried to sell it back to Pathfinder as provided by a provision in his contract (Tr. at 87). Silver told Rork that Pathfinder would not repurchase the stock because Pathfinder lacked the funds to do so. (Tr. at 88.)

The Court finds that Avant–Garde/FASCO, like Pathfinder, experienced severe cash-flow and financial problems over the course of its existence and was in dire need of cash as of August 1985. (Pl.'s Exs. 30, 31; Tr. at 372–73, 398–99, 432–33.) Some of the evidence in support of these conclusions is summarized as follows:

1. For the fiscal year ended January 31, 1985, Avant–Garde's current liabilities exceeded its current assets by $464,591.

2. The company's auditors stated that:

   In light of the current year loss and the Company's working capital position at January 31, 1985, if the Company is not successful in acquiring a substantial infusion of either debt or equity, it may not be able to continue in existence. (Pl.'s Ex. 31 at Bates 0013997.)

3. Before coming to work at FASCO, Spangenberg evaluated Avant–Garde for Silver. He told Silver that the company's products were poor and that it was not being managed well. (Tr. at 351–52.) Spangenberg testified that Avant–Garde was "essentially moribund in late 1984, if not earlier, and dependent on cash." (Tr. at 372.)

4. In April 1985, FASCO submitted to Silver a business plan requiring an infusion of $1,195,000 in May; Silver approved the plan. (Tr. at 360–64; Pl.'s Ex. 261.) SFPEF I was unable to provide the funds, however. On April 19, 1985, Silver wrote Spangenberg to state

that the fund could only provide $100,000 of FASCO's needed cash by June 30, 1985. (Pl.'s Ex. 262.) At that time, it was apparent that FASCO's business plan would not be met. (Tr. at 365.)

5. FASCO's failure to receive the required infusion of cash threatened its existence as a viable company. (*See* Tr. at 365.)

6. Silver urged Spangenberg to obtain bridge financing for FASCO until funds from SFPEF II were available. (Tr. at 1407.) Spangenberg tried to do so but failed. (Tr. at 373.)

7. Nevertheless, on July 19, 1985, at a FASCO board meeting held at Silver's New York residence, Silver committed SFPEF I to provide FASCO with $1,130,000 in "bridge financing" over a four month period beginning in August of that year. (Tr. at 374; Pl.'s Ex. 273.) Silver did not deliver on this promise, however. (Tr. at 374.)

The Court finds that Cipherlink was also experiencing crippling financial difficulties and that as of August 1, 1985, Cipherlink was in dire need of cash, needing approximately $3 million to meet its business plan. (Tr. at 1059.) Some of the evidence in support of these conclusions is recited as follows.

1. As of August 31, 1984, Cipherlink had an accumulated deficit of $621,529. (Pl.'s Ex. 34.)

2. Five months later, as of January 31, 1985, the deficit had more than doubled to $1,302,806.33 (Pl.'s Ex. 35), and the company's current liabilities exceeded its current assets by $22,655.38 (*Id.* (showing current assets of $150,950.55 and current liabilities of $173,605.93)).

3. Two months later, by March 31, 1985, Cipherlink had incurred another $260,275 in losses; its accumulated deficit had grown to $1,563,081.48. (Pl.'s Ex. 36.)

4. As of July 31, 1985, Cipherlink's accumulated deficit had grown to $2,083,249.89 and its current liabilities exceeded its current assets by $282,047.19 ($43,305.01–$325,352.20). (Pl.'s Ex. 41.)

The Court finds that several other Fund I companies were performing poorly by the end of December 1984. One Point, Sonostics, Personal Diagnostics, Critichem, and Mesa Diagnostics all showed signs of various degrees of poor performance. (*See* Pl.'s Exs. 44, 45, 54, 57, 61, 63, 64, 65, & 66.) Several of these companies operated at large net losses for the last fiscal year and had accumulated large deficits.

## D. Silver's Interests in the SFPEF I Portfolio Companies

The Court finds that Silver had a critical personal interest in the success of SFPEF I and its portfolio companies. He had significant ownership interests in Pathfinder and Avant–Garde/FASCO, had guaranteed the obligations of several of the Fund I portfolio companies, and sought to preserve a perception of value in the Fund I companies in order to raise money for the second fund. The Court summarizes some of Silver's interests as follows.

In addition to being Chairman of Pathfinder's Board of Directors, and its CEO, Silver had extensive personal interests in the success of Pathfinder. As of December 31, 1984, Silver owned 3.5 percent of Pathfinder's stock. ADSA owned 7.8 percent of the stock. SFPEF I owned 61.9 percent. (Pl.'s Ex. 20 at 22.)

In addition to his ownership interests in Pathfinder, Silver had personally guaranteed a large amount of Pathfinder's debt. On July 20, 1984, Silver personally guaranteed certain of Pathfinder's obligations to ITT Commercial Finance Corporation ("ITT") under a credit agreement. (Pl.'s Ex. 220.) In addition, prior to Pathfinder's November 1984 IPO, Silver had personally guaranteed certain of Pathfinder's leases and accounts payable to vendors. These guarantees amounted to approximately $391,000 by September 30, 1984. (Pl.'s Ex. 19 at 27.) Five months later, in March 1985, Pathfinder agreed to pay Silver a fee of $4,617 per month in exchange for his guaranteeing various of Pathfinder's obligations. (Tr. at 89–91; Pl.'s Ex. 221.) After that agreement, Silver incurred further obligations on Path-

finder's behalf. In December 1985, Silver personally guaranteed $175,000 in obligations Pathfinder owed to Hewlett–Packard Co. (Pl.'s Ex. 239.) At that time, Silver's personal guarantees on behalf of Pathfinder were greater than $1 million. (Stipulation of Facts ¶ 23.) In addition to the one million dollars that he personally guaranteed, Silver had caused SFPEF I to guarantee more than $1 million of Pathfinder's obligations before December 1985. (Stipulation of Facts ¶ 24.)

Similarly, Silver had extensive personal interests in Avant–Garde/FASCO. He was the controlling shareholder and Chairman of the Board of Directors of Avant–Garde (Stipulation of Facts ¶ 25; Pl.'s Ex. 297), and he was also a shareholder and Chairman of the Board of Directors of FASCO. (Pl.'s Ex. 297 at 9.) During various times, Silver personally guaranteed or caused SFPEF I to guarantee the obligations of FASCO. By December of 1985, these guarantees exceeded $250,000. (Stipulation of Facts ¶ 29.)

Silver was on the board of directors of both Cipherlink and Gateway.

### E. Silver's Plans for a Second Fund

Before March 1985, Silver discussed forming a venture capital fund that would invest primarily in health care entities with Jesse Acker ("Acker"), who was to become a general partner in SFPEF II. (Acker Dep. of 9/10/90 at 23–24.) They both believed that the computer industry was softening and that health care would become a "very, very strong, dynamically growing market." (Acker Dep. of 9/10/90 at 24.) On that basis, and based on his belief that the proposed fund would be one of the first of its kind to be investing primarily in health care, Acker agreed to become Silver's co-general partner in the second fund. (Acker Dep. of 9/10/90 at 24.)

The Court finds that, despite his professed intentions of investing primarily in health care companies, Silver planned to use funds from the second fund, SFPEF II, to help solve the problems of several SFPEF I portfolio companies, including Pathfinder, FASCO, and Cipherlink. Silver's intent, in this regard, is demonstrated by his representations to Rork at Pathfinder, Spangenberg at FASCO, and Eric Lesin at Cipherlink.

Before he formed SFPEF II, Silver told Rork that SFPEF I was "tapped out" and would be unable to satisfy the company's cash needs. (Tr. at 73.) Silver told Rork to find bridge financing until Silver could obtain funds from SFPEF II to bail Pathfinder out of its cash shortage. (Tr. at 72, 1406.) According to Rork, Silver represented that the second fund "would be more or less the second coming." (Tr. at 72.) Silver told Rork not to discuss the fact that the second fund would be used to "bail out" Pathfinder. (Tr. at 72–73.)

Similarly, Silver told Spangenberg that SFPEF I did not have any funds for the company, but that SFPEF II would be able to provide funds to FASCO. (Tr. at 1407.) Silver told Spangenberg to find interim financing until the SFPEF II funds were available. (Tr. at 1407.)

Silver made the same type of representations to Eric Lesin (Tr. at 1407), and to R & B Commercial Management ("R & B"), an investor in Cipherlink (Pl.'s Ex. 105; Tr. at 1069–70, 1407–08).

### F. The SFPEF II Confidential Offering Memorandum

In April 1985, Silver, with Acker's input, prepared a Confidential Offering Memorandum for SFPEF II. (Pl.'s Ex. 104; Tr. at 1258–59; Acker 9/10/90 Dep. at 63–64.) The investment program articulated in that Memorandum stressed that SFPEF II sought a "diversified portfolio composed primarily of emerging health sciences companies and secondarily of computer-related and other high technology companies." (Pl.'s Ex. 104 at 12.) The "Investment Program" outlined discussed a variety of available investments in the health care industry and noted that "there are considerably fewer investment opportunities in the computer industry than in the health sciences industry." (*Id.* at 19.) In addition, the memorandum made several representations that are particularly relevant here:

1. The Memorandum stated that SFPEF II would not borrow greater than twenty percent of the Fund's net asset value. (*Id.* at 26.)

2. The Memorandum discussed SFPEF I's investment in 11 portfolio companies, stating that the fund had invested $10.5 million in companies which ADSA valued at approximately $19.4 million. (*Id.* at 7.)

3. Based on ADSA's valuations, the Memorandum claimed a "pre-tax cumulative internal rate of return to SFPEF I's limited partners" of 45.03 percent per annum. (*Id.* at 7.) That discussion referred the prospective investor to the Memorandum's Exhibit II, which summarized the means used by ADSA to value the SFPEF I companies. (*Id.* at Bates 0011700.)

4. The Memorandum represented that Silver would conduct five different exhaustive audits prior to investing.

The Court finds that Silver provided, or caused to be provided, a copy of the Confidential Offering Memorandum to each limited partner in SFPEF II. (Stipulation of Facts ¶ 43.) Lincoln received its copy before August 1, 1985. (*Id.* ¶ 47.)

### G. Silver's Solicitation of SFPEF II Investors

The Court finds that Silver convinced Lincoln, and other investors, to invest in SFPEF II based on its purported status as a health care fund and based on SFPEF I's represented track record.

Silver convinced Lincoln, through Berk, to invest $2 million in SFPEF II. Lincoln had previously declined to invest in Silver's computer fund, SFPEF I. (Silver Dep. 274–77.) However, Silver solicited Lincoln's participation in SFPEF II, in April 1985, through communications with Patrick E. Falconio, senior vice president of LNIMC, stating that the fund would "specialize in health sciences investments" and that SFPEF I had returns in 1984 of "45% pre-tax." (Stipulation of Facts ¶¶ 33, 34; Pl.'s Ex. 107.) In May 1985, Silver represented to Falconio that SFPEF I "had done pretty well." (Silver Dep. at 299.)

In the Spring of 1985, Falconio sent Berk a letter dated April 23, 1985 from Silver to Falconio and the SFPEF II Confidential Offering Memorandum. (Pl.'s Exs. 104, 107; Tr. at 126.) Falconio told Berk that he wanted Lincoln to invest in a venture capital fund that was "specifically tied into the health care industry." (Tr. at 126.)

On June 24, 1985, Silver and Acker met with Berk and Falconio at Berk's office in Northfield, Illinois. During the meeting, Silver represented that SFPEF II would be a health care fund, that at least 75 percent of its capital would be invested in health care ventures, and that SFPEF II would set up an advisory committee to "make sure that Fund II would not invest in Fund I companies." (Tr. at 127–29; Pl.'s Ex. 114.) Silver said that the function of the advisory committee was to consult with ADSP with respect to the valuations of companies making up the fund and conflicts arising out of investments in SFPEF I. (Tr. at 131.) Later, Silver sent to Berk additional correspondence regarding SFPEF II. (Tr. at 268.) Based on Silver's oral and written representations, Berk recommended that Lincoln invest in SFPEF II.

Lincoln followed Berk's recommendation. In August 1985, Lincoln agreed to invest $2 million in SFPEF II. (Tr. at 135–37, 1223; Def.'s Ex. 136; Pl.'s Ex. 120.) Berk signed the SFPEF II Limited Partnership Agreement ("LPA") for Lincoln. (Tr. at 136.)

Silver also convinced James Ray, who managed Raybank, to invest some of that company's assets in SFPEF II. Raybank, formed by Ray, is a partnership which makes venture capital investments and investments in the stock and bond markets (Ray Dep. at 6, 10); it had previously invested in SFPEF I. (Ray. Dep. at 21.)

When Silver first approached him about investing in SFPEF II, Ray was not interested. He felt that SFPEF I was a "disaster" and that Pathfinder and Avant–Garde were overvalued investments. (Ray Dep. at 22.) However, Silver managed to convince Ray to meet with Silver to discuss Raybank's possible investment in SFPEF II. (Ray. Dep. at 31–32.) At a meeting between Ray, Silver, Acker and others at the Seattle Yacht Club, on July 15, 1985, Ray expressed his belief that Pathfinder was a "dog". (Ray Dep. at 31–32, 41.) Silver told Ray that he did not plan to invest further in Pathfinder and other

Fund I companies and that SFPEF II would invest "eighty percent or better" of its capital in health care companies. (Ray Dep. at 51; Acker 9/10/90 Dep. at 32–33; Acker 9/28/93 Dep. at 63.)

The Court finds that Raybank invested in SFPEF II based on Silver's representations.

The Court finds that Silver also convinced the Jefferson–Pilot Insurance Company to invest in SFPEF II. On December 17, 1985, Silver met with several officials of the Jefferson–Pilot Insurance Company ("Jefferson–Pilot") to discuss the company's possible investment in SFPEF II. Silver represented, in a memorandum, that SFPEF II would be a health care fund and that he expected SFPEF II to achieve "an internal rate of return by December 31, 1985 of 58% ... for its first five months of operation." (Mills Dep. Ex. 2 at 1.) Several weeks later, Silver spoke by telephone with W. Hardee Mills ("Mills"), a senior securities analyst with Jefferson–Pilot, concerning Jefferson–Pilot's possible investment in SFPEF II. (Mills Dep. at 24–26.) Thereafter, in February of 1986, when Mills visited Silver in Santa Fe, New Mexico, and on March 3, 1986, when the two spoke by phone, the two discussed SFPEF II's past and potential investments. (Mills Dep. at 29–34.) When discussing SFPEF II's past investments, Silver understated the fund's investment in Pathfinder and overstated its investment in NMR Imaging, a health-care investment. (Mills Dep. at 33–34, 55–57; Mills Dep. Ex. 8.)

The Court finds that Jefferson–Pilot invested in SFPEF II based on Silver's representations to Mills and others, particularly his representations that the SFPEF II was going to be a health-care fund. (Mills Dep. at 30, 42.)

The Court also finds that Silver similarly convinced Modern Woodmen of America to invest in SFPEF II. From February 1985 to some time before July 1986, Silver, on occasion, solicited the investment of Modern Woodmen of America ("Woodmen") through its Treasurer and Investment Manager Gary E. Stoefen ("Stoefen"); Silver made several references to his intentions to invest in the "health sciences" through a second venture capital fund. (Stoefen Dep. at 14–18.) At first, Woodmen decided not to invest in SFPEF II, but Silver persisted. (*See* Tr. at 16, 20–23.)

Sometime before July 1986, Silver and Acker met with Stoefen and others from Woodmen to discuss an investment by Woodmen in SFPEF II. (Stoefen Dep. at 21–23.) During the meeting, Silver told Stoefen that at least eighty percent of SFPEF II's funds would be invested in health-care delivery companies. (Stoefen Dep. at 23.) Silver followed the meeting with a telephone call and at least two letters, one dated July 29, 1986 and one dated August 18, 1986. (Pl.'s Exs. 196, 201.) In the July 29 letter, Silver stated that: (1) SFPEF II was a health care delivery venture capital fund, and (2) that he, and unnamed others, were "particularly pleased with the quality of the investments and deal flow for SFPEF II." (Pl.'s Ex. 196.) Silver made this statement despite the fact that, prior to the letter, Pathfinder had stopped selling computers and FASCO was on the verge of collapse. In the August 18 letter, to Kevin Kubik in Woodmen's investment department, Silver stated: "Please be assured that Santa Fe Private Equity Fund II is a health care delivery-oriented venture capital fund and that it intends to invest 80% of its committed capital in health care delivery companies." (Pl.'s Ex. 201.) Stoefen considered it so important that SFPEF II invest no more than 20 percent of its investments in non-health care related ventures that he demanded, as a condition to Woodmen's investing in SFPEF II, a written warranty that SFPEF II's "investments will substantially comprise (approximately 80%) of its committed capital to health-care delivery companies." (Pl.'s Ex. 202.) Silver provided the requested warranty by signing and returning Stoefen's request. (Pl.'s Ex. 202; Stoefen Dep. at 30–32.)

The Court finds that, based on Silver's representations, Woodmen invested in SFPEF II in August of 1986. When, in October 1986, Woodmen learned that Silver had not invested 80 percent of its capital in health-care investments, it decided, like Lincoln, to delay paying its second capital call. (Stoefen Dep. at 37.)

The Court finds that Silver solicited many other potential investors through the U.S. mails, sending a variety of different types of memoranda. (*see* Pl.'s Exs. 102, 106, 109, 130, 132, 137, 139, 141, 142, 150, 154, 160, 174, 180, 185, 188, 189, 192.) Silver also solicited investors and sent memoranda by Federal Express. (*See* Pl.'s Ex. 129, 153, 193.) These communications generally emphasized that SFPEF II would specialize in the health care industry or emphasized that SFPEF I had been successful, or failed to mention the failures of and investments in Pathfinder, FASCO, and Cipherlink. Between August 1985 and February 1987, Silver regularly sent materials via the United States mail in conducting the business of SFPEF II and ADSP. (Stipulation of Facts ¶ 40.) During that time period, Silver used the interstate mails and telephone lines numerous times. (Stipulation of Facts ¶¶ 36–41.)

The Court finds that between August 1985 and October 1986, Silver regularly used the United States mail and wires to cause the SFPEF II limited partners to wire their capital contributions to SFPEF II.

## H. SFPEF II

SFPEF II was formed in August of 1985. Under the terms of the Limited Partnership Agreement (the "LPA"), the limited partners were to contribute capital through installment payments called by Silver. (Pl.'s Ex. 120.) The LPA stipulated that Silver could not call more than fifty percent of a particular partner's contribution before December 1, 1986 and that Silver could not call more than seventy-five percent of such a contribution before August 1, 1987. (*Id.*)

Silver made SFPEF II's first capital call in August of 1985. The limited partners paid in $2,537,500. (Pl.'s Ex. 301.) From August until October 1985, Silver invested heavily in, or made payments to, Pathfinder, FASCO, Cipherlink, ADSA, ADSP, and SFPEF I. (*See* Pl.'s Exs. 301, 313, 314A, 315A.) By the end of October 1985, SFPEF II was out of cash and had overdrawn its account at the Los Alamos National Bank by more than $650,000. (*See* Tr. at 466; Pl.'s Ex. 144; Pl.'s Ex. 301.)

In November of 1985, Silver obtained two lines of credit for SFPEF II, pledging the same collateral for both. First, on November 6, 1985, Silver obtained a $2.5 million revolving line of credit from the First Interstate Bank of Denver, N.A. ("First Interstate"). (Pl.'s Exs. 70 (AY03790—AY03794), 78.) Silver pledged all of SFPEF II's capital calls as collateral for the line of credit and promised not to "pledge, mortgage, or otherwise encumber" or create a security interest in that collateral. (Pl.'s Exs. 70 (AY03790, AY03791), 78; Tr. at 1402.) SFPEF II borrowed $1.4 million under that line of credit, just under the maximum it could borrow based on the agreement's permitted borrowing base. (*See* Pl.'s Ex. 155 (stating that the most that could be borrowed was $1.45 million); Pl.'s Ex. 169.)

Second, on November 20, 1985, Silver, for SFPEF II, obtained a second line of credit, for $950,000, from the First National Bank of Boston ("Bank of Boston"). (Pl.'s Ex. 79; Tr. at 1402.) In return for the line of credit, Silver pledged the same collateral pledged to First Interstate and promised that the total liabilities of SFPEF II would not exceed $1,050,000, despite the fact that SFPEF II already owed $1.4 million to First Interstate.

The Court finds that from August 1985 through December 1985, Silver was investing predominantly in Fund I computer companies, primarily Pathfinder and Avant–Garde/FASCO, using Fund II monies. When it became apparent that Fund I would be unable to repay Fund II, Silver reclassified the receivables as investments.

Before the end of 1985, Acker became concerned with Silver's investments in Fund I computer companies and not in health care companies. (Acker 9/10/90 Dep. at 42–44.) He expressed his concerns on numerous occasions. (*Id.* at 43.) Silver indicated that solving the Pathfinder situation was his first priority. (*Id.* at 44; Acker 9/10/90 Dep. Ex. 7 at 180.) Acker eventually resigned.

The Court finds, that by the end of the 1985, SFPEF II, like SFPEF I, Pathfinder, Avant–Garde/FASCO, and Cipherlink, was in a financial crisis. And, the fund was nowhere close to fulfilling its mission of becoming a health care fund. As of December 31,

1985, SFPEF II's investments were as follows:

| | |
|---|---:|
| Cipherlink | $ 260,000 |
| Critichem | 92,000 |
| Avant–Garde/FASCO | 1,145,480 |
| NMR | 193,500 |
| Pathfinder | 1,753,567 |
| Preventacare | 999,999 |
| | |
| Total | $4,444,546 |

(Pl.'s Exs. 11, 345 (listing similar figures).) Of the $4,444,546 invested by Silver for SFPEF II, $1,192,999, or 26.8 percent, had been invested in health-care related companies, Preventacare and NMR. The remaining investments had been invested in Fund I computer-related companies. Before being audited by Arthur Young & Company, SFPEF II's ledger listed $2,503,801.13 in payments to SFPEF I portfolio companies on behalf of SFPEF I. (Pl.'s Ex. 315(a).) This $2.5 million was listed as a receivable from SFPEF I (Tr. at 696–97), which was given a going concern warning for the year ended December 31, 1985 (Pl.'s Ex. 5.) After the Arthur Young audit, the receivables were reclassified as investments. (Tr. at 696–97.) However, there was no documentation, existing prior to December 31, 1985, supporting the view that the $2.5 million was considered to reflect investments in Fund I companies, rather than as receivables from that Fund. (Tr. at 698.) Nevertheless, in February of 1986, Silver represented the payments to Fund I companies as investments to the limited partners. (*See* Pl.'s Ex. 345.)

Silver had assigned associate Kyle Lefkoff to the oversight of Pathfinder, including due diligence reviews. In the fall of 1985, Lefkoff suggested to Silver that Pathfinder be closed or placed into bankruptcy. Silver responded that doing so would prevent him from attracting investors in SFPEF II. (Tr. at 478.)

In January of 1986, Lefkoff thoroughly reviewed Pathfinder's financial status and twice recommended to Silver that Pathfinder be closed immediately and placed in bankruptcy. (*See* Tr. at 480–82.) Silver responded that he could not follow Lefkoff's recommendation because his personal guarantees would be called. (Tr. at 482.)

From February 20 to 22, 1986, the SFPEF II advisory committee met at Innisbrook in Tarpon Springs, Florida. (*See* Pl.'s Ex. 345.) Berk, for Lincoln, did not attend, but participated by phone. A memorandum dispensed by Silver revealed Silver's favoritism for "follow-on" investments in SFPEF I computer companies. (Pl.'s Ex. 345.) The members of the advisory committee were upset at Silver's failure to invest the limited partners funds as promised. They admonished him not to invest any more in Fund I companies.

On May 5, 1986, the SFPEF II Advisory Committee met for the second time. (Tr. at 150–53; Pl.'s Ex. 191.) In a memorandum prepared for the committee for that meeting, Silver represented that "It appears that SFPEF II has put a lid on its follow-on investments in non-health care companies at $3,500,000." (Pl.'s Ex. 191 at Bates 000084.) The memorandum also revealed, however, that Silver had invested an additional $741,-000 ($3,532,000 as of 4/30/86 compared with $2,791,000 as of 12/31/85) in Pathfinder, FASCO and Cipherlink since December 31, 1985. (Tr. at 150–52; Pl.'s Ex. 191 at Bates 000084.)

Based on Silver's revelations, Berk and Falconio decided to have Lincoln's internal auditor, David Martin, review SFPEF II's books and records. (Tr. at 153.) Martin conducted the review and found what he believed to be several "irregular" elements to the SFPEF II books, including a transfer of $330,000 of SFPEF II's funds to Silver's personal account. (Tr. at 153–54.)

Martin's findings and Silver's inadequate responses thereto, prompted Lincoln to hire, in July 1986, the accounting firm of Ernst & Whinney to look at SFPEF II's books. (Tr. at 154.) Ernst & Whinney provided Lincoln with a report dated August 8, 1986 summarizing its findings. (Pl.'s Ex. 198.) The report revealed that SFPEF II had conducted various transactions without "clear authority" under the LPA. (*Id.*) Among the potential violations was the fact that SFPEF II had outstanding borrowings in the amount of $2,735,705, or $235,705 more than the $2,500,-000 borrowing permitted by a waiver of SFPEF II's 20 percent of net assets value requirement. (Pl.'s Ex. 198.) The Ernst &

Whinney report also showed that SFPEF II had made a $1,088,406 transfer, interest free, to ADSP. (Pl.'s Ex. 198 at Bates 0002090.) The records also show that $333,202 and $23,700 had been lent to Silver interest free. (*Id.*) Of that, Silver paid back $316,000. (*Id.*)

Based on the Ernst & Whinney report, Lincoln decided to delay payment on its second capital call. (Tr. at 161–62.) Silver responded by attempting to answer questions posed by Lincoln and by demanding payment of Lincoln's second capital call. (Pl.'s Ex. 207.)

The Court finds that, despite the warnings of his investors, Silver failed to dedicate SFPEF II's funds to health care companies, as promised. During 1986, SFPEF II made small investments in health care funds in May ($25,000), July ($20,000), August ($30,000), and September ($40,000), representing 4 percent, 61 percent, 2 percent, and 2 percent of the funds invested in the corresponding month. In March, April, June, October, November, and December, no SFPEF II funds were invested in health care companies, despite the fact that the Fund dispersed $188,057, $289,701, $127,289, $130,581, $84,020, and $90,000 in those respective months. (*See* Pl.'s Ex. 301.)

The Court finds that, as of December 31, 1986, SFPEF II's had made the following investments:

| | |
|---|---|
| Cipherlink | $ 455,000 |
| Critichem | 41,688 |
| Avant–Garde/FASCO | 1,003,289 |
| NMR | 353,500 |
| Pathfinder | 2,493,791 |
| Preventacare | 999,999 |
| PDT Systems Corp. | 20,000 |
| Total | $5,367,267 [3] |

(*See* Stipulation of Facts ¶ 50.) Thus, from 1985 to 1986, Silver decreased SFPEF II's investments in FASCO and Critichem by a total of almost $192,413, increased investments in Pathfinder by $740,224, increased investments in Cipherlink by $195,000, increased investments in NMR by $160,000, held investments in Preventacare constant, and added a $20,000 investment in PDT Systems Corporation. (*Compare* Stipulation of Facts ¶ 49 with Stipulation of Facts ¶ 50.)

In September 1986, the SFPEF II limited partners met with the SFPEF I limited partners and with Silver at Hilton Head, South Carolina. After meeting with Silver, the limited partners from both funds decided to form an ad hoc committee consisting of a limited partner from each fund and a limited partner of both funds. The ad hoc committee was responsible for deciding what to do about the two funds and their general partners, ADSA and ADSP. Silver fought his removal, representing that he was pursuing leveraged buy outs, or LBOs, for Pathfinder and FASCO. (Def.'s Ex. 100.)

In February 1987, the limited partners of both SFPEF I and SFPEF II voted unanimously to remove ADSA and ADSP, respectively, as the general partners of SFPEF I and SFPEF II and to place those Funds into receivership. That same month, Judge Bruce Kaufman of the First Judicial District Court for the County of Santa Fe, New Mexico, appointed John Clark ("Clark") as receiver for SFPEF I and for SFPEF II.

Clark conducted a broad investigation of SFPEF I and SFPEF II, with the help of two law firms and an accounting firm. Based on his investigation, Clark recommended to Judge Kaufman that SFPEF I be placed into bankruptcy. In May 1987, Clark filed for SFPEF I a Chapter 7 petition for bankruptcy protection in the United States District Court for the District of New Mexico. At or near that time SFPEF II was, or became, responsible on a loan from Los Alamos National Bank ("LANB") to SFPEF I in the amount of $826,000, and on a note signed by SFPEF II in the amount of $350,000 from SunWest Bank. SFPEF II was also responsible for its $375,000 guarantee of Pathfinder's obligations to ITT. LANB, SunWest, and ITT all sued SFPEF II. Clark, for SFPEF II, settled each of those claims for less than the amount owed.

---

3. The parties' stipulation of facts sums these figures at $55,347,387. (Stipulation of Facts ¶ 50.)

That figure is incorrect.

Clark's investigation of SFPEF II revealed, in his opinion, the worst example of mismanagement, fraudulent use of funds, and self-dealing he had seen in thirty years in the business world. (Tr. at 812.) At trial, he testified:

> Well, generally speaking, I can tell you that I found that Fund II was the subject of gross mismanagement, fraud, deception, self-dealing. I have been in the business world for 30 years, roughly, and president of three different companies. I have never seen such gross mismanagement and fraudulent use of funds and self-dealing. I have never seen such activity.

(Tr. at 812.) The Court credits this testimony.

The Court finds that SFPEF II collected a total of $9,134,596, constituting $7,134,596 in paid-in capital before the appointment of the receiver, and an additional $2 million collected by the receiver to cover the claims of SFPEF II's creditors and to wind down the Fund's affairs. The Court finds that of the more than $9 million ultimately collected by SFPEF II, Lincoln contributed $900,000, consisting of $500,000 in response to the Fund's first capital call and an additional $400,000 to resolve the Fund's affairs. SFPEF II claims that Silver and ADSP caused its loss of $9,134,596. Lincoln claims that Silver and ADSP caused its loss of $900,000.

The Court finds that Silver's, and ADSP's, gross mismanagement, fraud, deception, and self-dealing caused SFPEF II a loss of $7,134,596, the paid-in capital before the appointment of the receiver. SFPEF II, by Lincoln, has failed to prove its entitlement to recovery of the additional $2 million collected by the receiver. In the opinion of the Court, Plaintiff has failed to prove that these damages were caused by Silver or ADSP. While SFPEF II may be entitled to various legal or accounting fees collected after the receiver was appointed, it has failed to distinguish those fees from funds collected to pay SFPEF II's creditors. The limited partners were not required to pay off SFPEF II's creditors; they had limited liability. The loss of such payments cannot, therefore, be attributed to Silver.

Similarly, the Court finds that Silver caused Lincoln a loss of $500,000, its first capital call contribution. While Silver may also have caused a loss of some part of the additional $400,000 paid-in by Lincoln, Lincoln has failed to prove such damages by distinguishing monies paid to creditors from monies paid for professional services.

## I. SFPEF II's Investments in, Payments to, and Guarantees for Silver, SFPEF I and its Portfolio Companies, ADSP and ADSA

The Court finds that Silver caused SFPEF II to make vast investments in Pathfinder from August 1985 through February of 1987, despite admitting that, as of late 1985, computer retailing was "a dumb place to be" (Tr. at 1275). Among the evidence in support of this proposition is the following.

1. SFPEF II invested $1,753,567 in Pathfinder between August 1985 and December 31, 1985. (Stipulation of Facts ¶ 49.)

2. SFPEF II invested $740,224 in Pathfinder between December 31, 1985 and December 31, 1986, for a total investment of $2,493,791. (Stipulation of Facts ¶ 49.)

3. SFPEF II paid out $264,934 for Pathfinder during February ($70,000), March ($25,000) and April ($169,934) 1986. (Pl.'s Ex. 301.) The payments included legal fees, inventory payments, accounting fees, and payroll expenses. (*Id.*)

4. SFPEF II paid out $145,705.50 for Pathfinder in May and June and received $30,000 back, a net increase of the Fund's investment of $115,705.50. (*Id.*)

5. SFPEF II apparently made no investments in Pathfinder in July 1986, when the company had ceased operations, but in August through October of that year, after Pathfinder had stopped selling computers, SFPEF II disbursed another $65,145.09 to pay a variety of fees for the company. (*Id.*)

The Court finds that Silver caused SFPEF II to invest more than a million dollars in

FASCO. The Court bases this finding on the following.

1. On August 28, 1985, Silver wrote Spangenberg a letter enclosing a $50,000 check for FASCO payroll and other "urgent accounts payable." (Pl.'s Ex. 275.)

2. SFPEF II eventually invested a total of $1,003,389 in FASCO. (Stipulation of Facts ¶ 50.)

The Court finds that Silver caused SFPEF II to invest $455,000 in Cipherlink by December 31, 1986. (Stipulation of Facts ¶ 50.) This finding is supported by the following.

1. On August 20, 1985, Silver sent Eric Lesin a letter advising that SFPEF II was committing $400,000 to Cipherlink. (Pl.'s Ex. 215.)

2. As of December 31, 1985, SFPEF II had invested $260,000 in Cipherlink. (Stipulation of Facts ¶ 49.)

3. SFPEF II's investment grew to $455,000 by the end of the year.

During the period of August 1985, when SFPEF II commenced investing, through December 31, 1986, SFPEF II disbursed greater than five and a half million dollars to, or on behalf of, Silver individually, ADSP, ADSA, or SFPEF I. (Tr. at 670–71.) These payments included $2,318,351.23 to ADSP, $2,503,801.12 to SFPEF I, and $284,322.13 to ADSA. (Tr. at 671–700.) Portions of that amount of money were repaid, and ADSP was entitled to a portion of that money as expenses for "Making/Selling Investment." (See Pl.'s Exs. 120, 301.) However, the Court finds that the Plaintiff proved by a preponderance of the evidence, that Silver engaged in a pattern of unlawful self-dealing that endangered the SFPEF II's limited partners' investments and eventually resulted in the partnership's loss of capital.

The evidence shows, that at minimum, Silver disbursed $2,318,351.23 to or on behalf of ADSP. (Tr. at 680; Pl.'s Ex. 314(a).) Interest was never charged on those funds. And, as of December 31, 1986, $1,263,407.32 was recorded in SFPEF II's books as a receivable from ADSP, and was not recorded as a payment for the making or selling of an investment. (Pl.'s Ex. 301.) That amount was never repaid to SFPEF II. (Tr. at 680.)

Of the $2,318,351.23 disbursed on behalf of ADSP, some were made directly to Silver, ADSA and SFPEF I. At minimum, the payments on behalf of ADSP included a $333,202.03 payment to Silver's individual account at LANB. The Court finds that this payment was part of a $1,140,00 wire transfer to SFPEF II's account at LANB in New Mexico from First Interstate in Colorado. Although Silver claims that the payment to his account was an error, it is the opinion of the Court that the evidence proved otherwise.

On November 4, 1985, Silver sent a letter to Bill Enloe, President of LANB. (Pl.'s Ex. 367.) The letter indicated that SFPEF II would acquire a $2.5 million line of credit from First Interstate, that SFPEF II could then borrow up to $1.44 million, and that SFPEF II would repay LANB $750,000 of the Fund's debt to that bank. Silver told Enloe to determine how he wished to apply the $750,000. On November 5, 1985, $1.140 million was wired from First Interstate to LANB. The funds were deposited into the following accounts:

| | |
|---|---|
| Silver's account | $ 333,202.23 |
| ADSP account | 54,575.97 |
| Avant–Garde account | 18,753.00 |
| ADSA Payroll account | 25,247.05 |
| ADSA account | 2,286.38 |
| Pathfinder account | 15,094.00 |
| SFPEF II account | 6,085.62 |
| SFPEF II account | 654,140.75 |
| SFPEF I account | 30,025.00 |
| Total | $1,140,000.00 |

(Pl.'s Ex. 360.)

On December 26, 1985, Silver repaid $316,000 of the $333,202.23 that had been transferred out of SFPEF II's account. (Pl.'s Exs. 301, 362; Enloe Dep. at 18–19.) Silver funded the repayment by taking out a personal loan in the amount of $316,000 at LANB. (Pl.'s Ex. 362; Enloe Dep. at 18–19.)

The Court finds that Enloe must have made the account transfers based on Silver's specifications and not by mistake. Based on Enloe's testimony as to his bank's practices and the uneven amounts transferred, the Court concludes that Enloe must have been directed to make the various transfers.

The $2,318,351.23 in payments on behalf of ADSP also included several large transfers to ADSA for payroll and other expenses. (Tr. at 682–85.) These transfers were made despite the fact that ADSA had been issued a going concern warning for the year ended December 31, 1985. (Pl.'s Ex. 17; Tr. at 687.)

Similarly, the $2,318,351.23 included payments on behalf of ADSP to SFPEF I for interest payments, attorneys' fees, and other expenses. These transfers were made despite the fact that SFPEF I warranted, and received, a going concern warning for the year ended December 31, 1985. (Pl.'s Ex. 5.)

The Court finds that Silver dispersed an additional $2,503,801.12 to or on the behalf of SFPEF I. (Tr. at 693.) These payments, but for a $4,432.18 payment in June of 1986, were investments in portfolio companies or cash transfers. They were originally recorded as receivables from SFPEF I, but were reclassified as investments prior to Arthur Young & Company's audit for the year ended December 31, 1985. (Tr. at 695–97.)

The Court finds that Silver dispersed an additional $284,322.13 to ADSA from SFPEF II. (Tr. at 699–700.)

In addition, through December 1985, Silver used SFPEF II accounts to cover the overdrafts of SFPEF I, ADSP, and ADSA at LANB.

Finally, the Court finds that Silver caused SFPEF II to guarantee, on September 5, 1986, an $826,705.89 loan to SFPEF I from LANB, for which Silver pledged the capital calls of some of the SFPEF II limited partners, that Silver had SFPEF II sign a note in the amount of $350,000 due to the Sun-West Bank,[4] and that Silver had SFPEF II assist ADSP in obtaining a $150,000 loan, on July 22, 1986, from the Western Bank of Santa Fe, for which Silver assigned certain capital calls of SFPEF II limited partners, as collateral.

**4.** The parties engaged in a substantial dispute over whether or not this note, signed by SFPEF II, evidences SFPEF II's guarantee of a loan to SFPEF I in the amount of $350,000. In the opinion of the Court, the asserted guarantee is not clearly demonstrated by the authority cited

## J. The Financial Condition of several SFPEF I Portfolio Companies after the formation of SFPEF II

The Court finds that, despite large infusions of cash from SFPEF II, Pathfinder's computer-related business failed. Steve Rhodes and then Jeffrey Boetticher succeeded Rork as President of Pathfinder. (Tr. at 1275.) In the fall of 1985, Pathfinder was unable to obtain IBM or Apple computers for sale. (Tr. at 108–112; Pl.'s Exs. 19, 20, 23, 26.) However, Pathfinder acquired two small computer retail chains, Computerama and Rainbow Computing, both of which sold IBM computers. (Tr. at 107–09; Pl.'s Exs. 23, 26, 236.) Pathfinder was therefore able to sell IBM computers through these stores. Soon thereafter, IBM terminated Computerama's and Rainbow Computing's Retail Dealer Agreements when Pathfinder failed to pay those companies' combined obligations of $580,023.53, which Pathfinder assumed. (Tr. at 108–09; Pl.'s Ex. 236.)

On January 10, 1986, Pathfinder's Board of Directors met. (Tr. at 480–81.) Silver proposed, in a memo, closing 5–7 stores or using proceeds from a FASCO IPO to fund Pathfinder. (Id.; Pl.'s Ex. 242.) In February 1986, Pathfinder started closing stores. (Tr. at 1289.) The closings failed to revive the business and, as of July 7, 1986, Pathfinder had determined to cease operations of its computer retail business and was attempting to sell its inventory to its distributors. (Pl.'s Ex. 253.)

The Court finds that, after Pathfinder ceased its computer retail business, Silver hoped to use the Pathfinder shell to conduct an LBO of a company that could generate sufficient cash to reduce Pathfinder's debts. The best, among several candidates, for this approach was Kobrin Builders Supply, Inc. ("Kobrin"). Kobrin was an Orlando, Florida based distributor of drywall, plastering and stucco materials. (Pl.'s Ex. 191 at 2.) In memoranda to SFPEF II investors in March and May of 1986, Silver presented the idea.

by Plaintiff. However, Plaintiff's argument based on the evidence submitted at trial is within the permitted scope of argument and is not the ethical violation asserted by Silver in exhibits to his post-trial memoranda.

(Pl.'s Exs. 8, 191.) Silver represented that a six million dollar purchase of Kobrin could be done with only $600,000 in investor cash. However, a draft stock purchase agreement for that LBO indicated that the deal would have required five million dollars of Pathfinder's cash. (Def.'s Ex. 89.) Despite Silver's pursuit of the deal through the filing of this lawsuit, it never succeeded. And, in the opinion of the Court, the evidence in this case proved that it could not have succeeded. Pathfinder lacked the cash to make the deal happen and the SFPEF II investors were neither willing nor required to provide more cash for this unusual deal. Silver has contended that Lincoln wrongfully prevented him from completing the Kobrin LBO or another LBO. The Court disagrees. The evidence proved that Silver lacked the credibility with his investors and the cash to make the deal. (Tr. at 339–40.) Moreover, the Court finds that his suggested LBOs were highly improbable, if not impossible, and that Lincoln and the other limited partners were justified in terminating ADSP as SFPEF II's managing general partner.

The Court finds that despite the more than one million invested by SFPEF II, FASCO failed.

To try to save money, Avant–Garde started directly marketing its products. Under this method, the sales staff were compensated based on the number of shipments made rather than on receipt of funds. After adopting this approach, Avant–Garde experienced large scale returns of its products. (Tr. 367–69.) The company averaged a monthly rate of return of 57.87 percent of sales. (Id.) By November 19, 1985, it was clear that Avant–Garde was failing to make its projected Achieveware sales. (Pl.'s Ex. 279.) Having relied heavily on the Achieveware line, the company was in dire straits.

For the ten months ended November 30, 1985, FASCO lost $1.5 million on sales of $1.9 million. (Stipulation of Facts ¶ 30.) For the fiscal year ending January 31, 1986, FASCO incurred a net loss of $1,962,000 and had an accumulated deficit of $4,871,000; its current liabilities exceeded its current assets of $721,000. (Pl.'s Ex. 297, at F–2, F–5.) Arthur Young & Company prepared FASCO's January 31, 1986 audited financial statements and issued a going concern warning. (Pl.'s Ex. 297; Tr. at 995.)

Silver's attempts at saving the company failed. Although Silver and Spangenberg sought to conduct an IPO for FASCO, Spangenberg had strong reservations about the data submitted to the SEC and the underwriter eventually pulled out. FASCO continued to experience cash-flow problems through 1986, and in August 1986, Silver reported to the SFPEF I and SFPEF II investors that it was an "insolvent" company with a failed business plan. (See Tr. at 392, 398–400, 962, 985; Pl.'s Exs. 6, 291, 292.)

Similarly, despite SFPEF II's investment of $455,000, Cipherlink ceased its operations. Between August 1985 and December 1986, Cipherlink tried to attract other investors and capital. (Tr. at 1044, 1066–70.) These attempts resulted in $700,000 in new investments, $455,000 of which was provided by SFPEF II. The company continued to decline until it ceased its operations on December 16, 1986. (Tr. at 1055.)

### K. Silver's Wrongful Acts on Behalf of several of the SFPEF I Portfolio Companies

In the opinion of the Court, the Plaintiff proved by a preponderance of evidence that Silver and ADSP engaged in a pattern of criminal activity by using fraudulent misrepresentations as a regular part of Silver's business. The Court finds, as a matter of fact, that Silver's fraudulent activity was of the frequency and nature that it would have continued throughout the parties' anticipated ten year relationship. The Plaintiff proved the following wrongful acts by Silver and his entities.

1. Silver made several material misrepresentations or omissions in the SFPEF II Confidential Offering Memorandum. The SFPEF II Confidential Offering Memorandum represented that SFPEF I's $3 million investment in Pathfinder was worth $7.5 million as of December 31, 1985. (Pl.'s Ex. 104.) It was not, even under the valuation terms used by Silver. According to Plaintiff's expert, Richard S. Azimov, whose testimony the

Court credits,[5] Silver's valuation methods were acceptable, but the correct valuation method was not used in valuing Pathfinder. (Tr. at 797–98.) In Exhibit II to the Confidential Offering Memorandum, Silver listed ADSA's means of evaluating the value of its portfolio companies. (Pl.'s Ex. 104 at Bates 0011700.) The first two methods related to publicly traded companies, valuing them at market value and 80% of market respectively. The next three means of valuing the company relate to private companies and depend on whether or not the company has had a "significant non-affiliated transaction with an institutional investor" at a price above cost. The final method states: "If the company has had major setbacks, the Fund's investment is marked down to liquidation value."

The Court finds that, at the time Pathfinder was evaluated for the Confidential Offering Memorandum, there was no true public market for the stock. Instead, it was held by only 70–72 investors who could not control the stock's price, primarily because the Santa Fe funds controlled 90 percent of the stock. (Tr. at 788–89.) Although Pathfinder stock had been offered to the public in an IPO in November 1984, the offering price was a negotiated price having no relation to the actual worth of the company. (Tr. at 788, 792; Pl.'s Ex. 19.)

The Court finds that, as of November 1984, Pathfinder had undergone several "major setbacks" that warranted that the stock be valued at liquidation value. Pathfinder had received a going concern warning, had a large accumulated deficit, had never earned a profit, had failed to keep even a single store profitable, did not carry IBM or Apple, and was unable to obtain credit from a bank or other financial institution. (Tr. at 661–62, 766–791.)

Although the Confidential Offering Memorandum was dated April 1985, it did not contain information showing that Pathfinder's financial condition had markedly deteriorated since December of 1984. (Tr. at 660–62.)

The Confidential Offering Memorandum overstated the value of Avant–Garde, representing that SFPEF I's investment of $1,745,000 was worth $2,520,000 when it should have been valued at no more than cost. (Pl.'s Ex. 104; Tr. at 665–66.) Like Pathfinder, Avant–Garde had received a going concern warning, had a large accumulated deficit, and poor cash-flow. (Tr. at 665–66.)

The Confidential Offering Memorandum overstated SFPEF I's rate of return. The Memorandum stated that the fund had generated a "cumulative pretax internal rate of return of 45.03 percent" for its investors. (Pl.'s Ex. 104.) Had Pathfinder and Avant–Garde been properly valued that return would have been much lower. (See Tr. at 667–69.)

2. Silver intentionally misled Berk at Lincoln, Ray at Raybank, Mills at Jefferson–Pilot, and Stoefen at Woodmen as to Silver's intentions with respect to SFPEF II's investments. Silver was already planning to use Fund II investments to support Fund I portfolio companies, despite his representations to the contrary.

3. Silver broke several promises made to the limited partners.

Although the SFPEF II Confidential Offering Memorandum represented that Silver would conduct five "exhaustive" audits prior to investing, Silver did not conduct any before causing SFPEF II to invest in Pathfinder. (Pl.'s Ex. 104; Acker 9/10/90 Dep. Ex. 7 at 152–53.)

In February of 1986, Silver promised to stop investing in Fund I computer companies. But, as indicated below, he continued to do so.

As of February 1986, SFPEF II had borrowed approximately 88 percent of its net asset valued despite the LPA's provision limiting such borrowing to twenty percent of the net asset value of

5. Much of Azimov's testimony was supported by the testimony of Silver's expert, Richard Dumler.

(See, e.g. Tr. at 948–49.)

the partnership. (Tr. at 141–42; Acker 9/10/90 Dep. Ex. 7 at 156; Pl.'s Ex. 120 § 6(i)(6).) However, all of the limited partners of SFPEF II agreed to a waiver of that twenty percent requirement and instead permitted borrowing up to $2,500,000. (Pl.'s Ex. 198.) As of August 8, 1986, Silver had exceeded that amount, having had SFPEF II borrow $2,735,705, or $235,705 above the permitted limit. (*Id.*)

Under the LPA, Silver was to have delivered audited financial statements, for the year-end 1985, by March 31, 1986. (Pl.'s Ex. 120 ¶ 9; Tr. at 153.) As of May 1985, the financial statements had not been delivered. (Tr. at 153.)

Under the LPA, SFPEF II was not permitted to invest more than $500,000 in other venture capital oriented funds. (Pl.'s Ex. 120 5 6(h)(7).) Silver violated this provision by transferring more than $500,000 to each ADSP and SFPEF II. As of December 31, 1986, SFPEF II had receivables from ADSP totalling more than $1.26 million. And, as of that date, SFPEF II had transferred more than $2.5 million to SFPEF I companies, which transfers were originally treated as receivables from SFPEF I.

Finally, under the LPA, SFPEF II was prohibited from investing in a "partnership which is affiliated with the General Partner or A. David Silver where either the General Partner or any of its partners (including A. David Silver) is either the general partner of, or general partner of such general partner of, such partnership." (Pl.'s Ex. 120 § 6(h)(7).) This provision thus prohibits SFPEF II from investing in ADSA, ADSP, and SFPEF I, all of which received large payments from SFPEF II.

4. At a meeting of the SFPEF I limited partners taking place shortly after April 29, 1985, Silver relied on a FASCO business plan containing false cash-flow projections to sell the participants on the viability of FASCO and its potential for going public. (*See* Tr. at 362–65, 434–35, 990–91, 1005–07.) He used the same plan to attract underwriters for FASCO's planned IPO. (Tr. at 364–65.)

5. Silver planned to use the proceeds of FASCO's IPO to fund Pathfinder and thereby defraud the FASCO stock purchasers. (Tr. at 480–81.)

6. Silver planned to use fraudulent representations in issuing FASCO stock. Prior to December 11, 1985, FASCO filed a Registration Statement on a Form S–18 with the SEC regarding FASCO's planned IPO. (Pl.'s Ex. 282.) According to Spangenberg, he feared that FASCO might be committing securities fraud because the S–18 contained "fraudulent" sales and profit projections. (Tr. at 394–98.) Spangenberg expressed his reservations with Paul Hickey of Hickey, Kober, Inc., the IPO's underwriter. (Tr. at 459–61.) Spangenberg also wrote several letters to Silver expressing his concerns. (Pl.'s Exs. 288, 292, 346; Tr. at 397–99, 458–59.) Spangenberg's concerns over the fraudulent statements in S–18 led him to resign as a FASCO director in May 1986 and were part of the bases for Spangenberg's resignation as a FASCO officer on June 11, 1986. (Tr. at 401–04.) The underwriter of the FASCO IPO eventually decided not to go through with the offering. (Tr. at 989–990.)

7. In a 1986 plan to get IBM computers for Pathfinder, Silver, a member of Gateway's board, arranged for Gateway, which repackaged and distributed IBM computers, to purchase IBM computers as a "straw man" and then sell IBM products to SFPEF I; the Fund then shipped the products to Pathfinder (Tr. at 291–92), causing IBM to take an unknowing risk on Pathfinder and SFPEF I. Silver orally promised Gateway that SFPEF I would guarantee payment for the IBM computers. (Pl.'s Ex. 302 at 4.) When Pathfinder and SFPEF I failed to pay, Gateway sued Silver, ADSA, and SFPEF I for approximately $460,000. (Pl.'s Exs. 5 at Bates 0001860, 198 at Bates 0002089, 302 at 4.)

8. Silver invested SFPEF II funds in SFPEF I companies, contrary to his

promises and representations, contrary to the interests of the SFPEF II investors, and in spite of their demands.

Throughout his management of SFPEF II, Silver sent the limited partners numerous documents describing and relating to prospective health-care investments for SFPEF II. (*See, e.g.* Pl.'s Exs. 111, 134, 138, 142, 143, 147.) Silver also informed his investors that Dr. Larry H. Coleman, who had extensive experience in venture capital health-care investments, had been hired by ADSP to assist with SFPEF II's investments. (Pl.'s Ex. 159.)

On February 20–22, 1986, the SFPEF II Advisory Committee met in Tarpon Springs Florida. (Pl.'s Ex. 345.) Silver provided them with data showing that of $4,450,794 in investments, he had invested $1,753,566 in Pathfinder, $1,151,730 in FASCO, and $260,00 in Cipherlink, a total of $3,165,296 in SFPEF I computer companies which constituted 71 percent of the SFPEF II's investments. (Pl.'s Ex. 345.) In addition, Silver had invested $193,500 in NMR and $92,000 in Critichem, both of which were non-computer SFPEF I companies. (Pl's Ex. 345.)

The limited partners expressed dissatisfaction with Silver's investments in computer companies and in "sick" Fund I companies. (Tr. at 144–46.) They told him not to make any more investment in the computer area and requested that he make biweekly reports advising them of what he was doing. (Tr. at 146.) At the meeting, Silver appeared responsive to the investor's requests. (Tr. at 276.)

In memoranda dated March 6, 1986 and April 11, 1986, Silver represented that SFPEF had not made additional investments in Pathfinder. (Pl.'s Exs. 175, 183; Tr. at 146–49.) In the March 6 memo, Silver stated: "We may have to assist two or three of them [the entrepreneurs in SFPEF I companies] with mid-March obligations, but at a lower dollar amount than in the past." (Pl.'s Ex. 175.)

On March 20, 1986, Silver sent a memorandum to all SFPEF II limited partners representing that further SFPEF II investments "will be substantially in the health-care delivery field until the proportion of health delivery investments to all other investments is 4:1." (Pl.'s Ex. 177 at 2.) The memorandum noted that only thirty percent of SFPEF II's investments were then in the health care delivery industry but that "This ratio bears no relation to the eventual SFPEF II portfolio which is intended to contain 20–24 companies, of which 80 percent or 16–20 will be in the health care delivery field." (Pl.'s Ex. 177 at 2.)

Nevertheless, on March 20, 1986, Silver had SFPEF II guarantee, without consideration, $375,000 in Pathfinder's obligations to ITT. (Pl.'s Exs. 11 at 11, 70 at AY03836—AY03340; Tr. at 815.) In addition, on April 8, 1986, Silver represented to ITT that it would be paid by check after SFPEF II investors wired funds to their bank prior to proposed draw dates. (Pl.'s Ex. 181.)

From February 1986 until December of 1986, Silver put a net $445,784.59 into Pathfinder, despite the fact that it started closing stores in February and stopped selling computers in July.

As of December 31, 1986, Silver had put 46.6 percent of SFPEF II's investments into Pathfinder, despite the fact that in 1985 Silver considered computer retailing a "dumb place to be" and despite the fact that, as Silver's own expert witness testified, investing more than forty percent of a venture capital fund's assets in one company is considered grossly negligent in the industry. (Tr. at 945).

9. Silver breached his agreement with First Interstate by borrowing from the Bank of Boston.

10. Silver defrauded the Bank of Boston by pledging SFPEF II's future capital calls as collateral when they had already been pledged to First Interstate and by promising to keep SFPEF II's total liabilities under $1,050,000 when it already owed $1.4 million to First Interstate.

11. Silver commonly transferred SFPEF II funds to himself individually, ADSP,

ADSA, SFPEF I, Pathfinder, FASCO, and Cipherlink. Although often treated as loans, the transferees were not charged interest. In addition, much of the "loans" were not paid back and were made at a time when their repayment was highly doubtful.

12. Silver directed Enloe at LANB to deposit $333,202.23 of a payment to SFPEF II in Silver's personal account. Although Silver repaid $316,000, without interest, he has not accounted for the remainder.

13. Silver permitted the payment of $9,500 in property taxes on his New York residence out of SFPEF II's account at LANB. Silver "repaid" the $9,500 to ADSP by charging ADSA prepaid rent for the office space in Silver's New York residence; it was never repaid to SFPEF II. (Tr. at 679–80.)

The Court finds that these acts, excepting those representations made to the investors prior to their becoming limited partners, proximately caused SFPEF II's loss of value, an indirect injury to Lincoln and the other investors. However, the Court also finds that Silver's written and oral representations, by themselves, proximately caused each investor's loss of contributed capital prior to the appointment of a receiver, a direct injury.

### L. Summary

The Court finds that Silver intended to continue his fraudulent practices until either the SFPEF I companies were healthy or until SFPEF II was out of capital. Had the investors not discovered Silver's fraud, it would have continued throughout the parties' relationship.

Silver contends that SFPEF II's loss of value was due to the investors refusal to let the fund mature into a health care fund and their refusal to let him complete the LBOs of Pathfinder and other Fund I portfolio companies. The Court finds that this theory is not supported by the evidence. Silver's management of SFPEF II throughout 1986 gave no indication that he intended to shift the Fund's focus away from supporting Pathfin-

der and Avant–Garde/FASCO and his suggested LBOs were preposterous and would have placed investor money in industries that were completely foreign to what had been represented.

### III. CONCLUSIONS OF LAW

#### A. SFPEF II's and Lincoln's RICO Claims

##### 1. Introduction

In Counts VIII–XIII, Lincoln, for SFPEF II and for itself, claims that Silver violated sections 1962(a), 1962(b), and 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") by using income derived from a pattern of RICO activity to invest in the operations of several enterprises, by maintaining control of several enterprises through a pattern of RICO activity, and by conducting an enterprise's affairs through a pattern of RICO activity. In the opinion of the Court, Silver violated each of the above referenced sections of Title 18 of the United States Code.

In order to prove a civil RICO claim under sections 1962(a), 1962(b), or 1962(c), a plaintiff must show that (1) the defendant has participated in a pattern of racketeering activity in violation of 18 U.S.C. § 1962 and (2) the plaintiff is injured in its business or property. 18 U.S.C. § 1964 (1988); *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1464 (7th Cir.1992). To prove the first of these requirements, a plaintiff must show:

(1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.

*Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).[6] A civil RICO plaintiff must prove its claims by a preponderance of the evidence. *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1303 (7th

---

**6.** This case does not stand, however, for what constitutes a pattern of racketeering activity. *See*

*United States v. Private Sanitation Indus. Ass'n,* 793 F.Supp. 1114, 1126 n. 16. (E.D.N.Y.1992).

Cir.1987), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989).

The Court finds that Defendant Silver, a "person" under 18 U.S.C. § 1961(3), invested fraudulently derived funds in SFPEF· I, ADSP, Pathfinder, and Avant–Garde/FAS-CO, each of which is an "enterprise", under 18 U.S.C. § 1961(4), affecting interstate commerce. The Court finds that Silver maintained interests in and controlled SFPEF I, ADSP, Pathfinder, and Avant–Garde/FASCO through fraudulent conduct. And, the Court finds that Silver conducted SFPEF II's affairs through fraudulent conduct. Therefore, if Silver's fraudulent conduct may be deemed to have amounted to two or more "predicate" acts constituting a "pattern" of "racketeering activity", then he has violated sections 1962(a), 1962(b), and 1962(c). In the opinion of the Court, Silver engaged in a pattern of racketeering activity.

### 2. *Predicate Acts*

The Court finds, by a preponderance of the evidence, that Silver engaged in numerous predicate acts constituting "racketeering activity" as defined in 18 U.S.C. § 1961(1). Among the acts constituting "racketeering activity" under section 1961(1) are any act of mail fraud, in violation of 18 U.S.C. § 1341, any act of wire fraud, in violation of 18 U.S.C. § 1343, any act of financial institution fraud, in violation of 18 U.S.C. § 1344, and "any offense involving ... fraud in the sale of securities ... punishable under any law of the United States." 18 U.S.C. § 1961(1). Here, Plaintiff has proven that Silver conducted numerous acts of mail and wire fraud, at least two acts of bank fraud, and at least four acts of securities fraud.

#### a. Mail and Wire Fraud

■ To prove mail or wire fraud a plaintiff must show that the defendant used the United States mail or interstate wires in furtherance of a scheme to defraud. 18 U.S.C. § 1341; 18 U.S.C. § 1343. The plaintiff must prove three elements: (1) the defendant's participation in a scheme to defraud; (2) the defendant's use of the mail or wires in furtherance of that scheme; and (3) the defendant's intent to defraud. *United States v. Walker,* 9 F.3d 1245, 1249 (7th Cir.1993)

(stating the three elements of mail fraud), *cert. denied,* 511 U.S. 1096, 114 S.Ct. 1863, 128 L.Ed.2d 485 (1994); *United States v. Cosentino,* 869 F.2d 301, 308 (7th Cir.) (stating the three elements of mail fraud), *cert. denied,* 492 U.S. 908, 109 S.Ct. 3220, 106 L.Ed.2d 570 (1989); *Caraluzzi v. Prudential Secs., Inc.,* 824 F.Supp. 1206, 1211 (N.D.Ill. 1993) (stating the three elements of mail or wire fraud); *Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co. of New York,* 751 F.Supp. 727, 729–30 (N.D.Ill.1990) (stating the three elements necessary to state a claim for mail or wire fraud), *aff'd,* 941 F.2d 561 (7th Cir.1991), *cert. denied,* 502 U.S. 1099, 112 S.Ct. 1182, 117 L.Ed.2d 426 (1992); *see also Messinger v. United States,* 872 F.2d 217, 221 (7th Cir.1989) (stating that mail fraud has two elements, existence of scheme to defraud and use of the mails in furtherance thereof); *United States v. Dempsey,* 768 F.Supp. 1256, 1268 (N.D.Ill. 1990) (stating that mail or wire fraud has two elements, citing *Messinger* ). The scheme need not succeed. *See United States v. Richman,* 944 F.2d 323, 330–31 (7th Cir.1991) (indicating that scheme need only seek the fraudulent deprivation of a victim's money or property); *Ginsburg v. United States,* 909 F.2d 982, 988 n. 8 (7th Cir.1990) (stating that this position is "not without support"). And, no particular mailing or wire need contain a misrepresentation. *See Ferleger v. First Am. Mortgage Co.,* 662 F.Supp. 584, 588 (N.D.Ill.1987) (stating that mailing "routine, completely accurate documents" violates the mail fraud statute when done in furtherance of a scheme to defraud).

■ In the opinion of the Court, Silver intentionally, regularly, and repeatedly used the mails and wires (through phone conversations) to further several independent, but related, schemes to defraud. While drawing lines between distinct schemes is difficult, the Court finds that Silver engaged in the following schemes, or fraudulent transactions, each of which was related to Silver's larger schemes to keep supporting Fund I companies and to preserve, and improve, his individual finances at the expense of his investors: (1) a scheme to defraud SFPEF II's investors ·and potential investors; (2) a

scheme to divert SFPEF II's funds to himself and to related entities; (3) a scheme to defraud the Bank of Boston and First Interstate; (4) a scheme to defraud IBM through the purchase of its computers through a "straw man", Gateway, and (5) a scheme to defraud prospective purchasers of FASCO stock. Each mailing placed in the United States mails and each interstate phone conversation in furtherance of these schemes constitutes a violation of either 18 U.S.C. § 1341 or 18 U.S.C. § 1343.

### b. Bank Fraud

■ To prove bank fraud, or financial institution fraud, in violation of 18 U.S.C. § 1344, a plaintiff must show either that the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution, section 1344(1), or knowingly executed or attempted to execute a scheme to obtain any of the monies under the custody or control of a financial institution by means of false or fraudulent pretenses, section 1344(2). 18 U.S.C. § 1344; *see United States v. LeDonne*, 21 F.3d 1418, 1425 (7th Cir.1994) (indicating that the two subsections of section 1344 are "separate offenses"), *cert. denied*, 513 U.S. 1020, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994). Proof of a misrepresentation is only required for a section 1344(2) violation; section 1344(1) only requires proof of a recognizable scheme formed with the intent to defraud a financial institution. *Id.* Specific intent to defraud may be established by circumstantial evidence. *Id.* at 1426. In the opinion of the Court, Plaintiff proved, by a preponderance of the evidence, two different schemes to defraud financial institutions.

First, the Court finds that Silver violated section 1344 when he sought, and acquired, a line of credit for SFPEF II from the Bank of Boston. Silver pledged the same collateral to the Bank of Boston, on November 20, 1986, that he had pledged two weeks earlier to First Interstate. By knowingly misrepresenting the value of SFPEF II's collateral for its $950,000 loan, Silver committed bank fraud. *See United States v. Johnson*, 16 F.3d 166, 173 (7th Cir.1994).

Second, the Court finds that Silver violated section 1344(2) by making several unautho-

rized transfers to himself, SFPEF I, ADSA, ADSP, Pathfinder, and Avant–Garde/FASCO. Silver, like the defendant in *United States v. Briggs*, 965 F.2d 10 (5th Cir.), *reh'g denied*, 977 F.2d 576 (5th Cir.1992), *cert. denied*, 506 U.S. 1067, 113 S.Ct. 1016, 122 L.Ed.2d 163 (1993), made implied representations that he had the authority to transfer funds to himself and to entities that he controlled, exposing LANB, and perhaps First Interstate to potential liability. *See id.* at 11–13. Under *Briggs*, the Court finds that Silver committed bank fraud. Although other Circuits have disagreed with the theory relied on in *Briggs*, that case represents the majority view and has been followed by another district judge in this circuit. *See United States v. 105,800 Shares of Common Stock*, 830 F.Supp. 1101, 1128–29 (N.D.Ill. 1993); *see also Stiller v. Sumter Bank & Trust Co.*, 860 F.Supp. 835 (M.D.Ga.1994) (following *Briggs* ).

### c. Securities Fraud

As noted above, section 1961(1) includes in its definition of "racketeering activity" "any offense involving ... fraud in the sale of securities ... punishable under any law of the United States." 18 U.S.C. § 1961(1). Securities fraud is punishable under section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and therefore constitutes "racketeering activity" when proven. It has been proven here.

■ In order to prove a violation of section 10(b), or Rule 10b–5 through which it is enforced, 17 C.F.R. § 240.10b–5, a plaintiff must prove that the defendant: (1) made an untrue statement of material fact or omitted to state a material fact which made statements misleading, (2) in connection with a securities transaction, (3) with the intent to mislead, and (4) which caused the plaintiff's loss. *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir.1989); *Nielsen v. Greenwood*, 849 F.Supp. 1233, 1241–42 (N.D.Ill.1994) (adopting a report and recommendation citing *Schlifke* ); *Wright v. International Business Machines Corp.*, 796 F.Supp. 1120, 1124 (N.D.Ill.1992) (relying on *Schlifke* ); *see also Pippenger v. McQuik's Oilube, Inc.*, 854 F.Supp. 1411, 1416–17 (S.D.Ind.1994) (citing *Schlifke* ). These elements may be qualified

by noting that only material misstatements or omissions constitute fraud, that only purchasers or sellers may assert claims for securities fraud under the Securities Exchange Act of 1934. *See In re VMS Secs. Litig.*, 752 F.Supp. 1373, 1393–1399 (N.D.Ill.1990). In the opinion of the Court, each of the *Schlifke* requirements is satisfied.

■ Silver's sales of partnership interests in SFPEF II are clearly securities transactions. In making his sales, Silver made several material misleading statements and omissions. The Confidential Offering Memorandum misstated the nature of the fund as a health care fund, the value of Pathfinder, the value of Avant–Garde/FASCO, and the success of SFPEF I. Silver failed to state to his potential investors that, at the time he was organizing SFPEF II, he intended to immediately assist SFPEF I companies. In addition, Silver mislead his investors by stating that 75 to 80 percent of SFPEF II investments would be in the health care industry.

Although Silver contends that, had he received the rest of SFPEF II's capital calls, the Fund would have met his 75 percent goal, the Court rejects this assertion. It does not make Silver's valuations any less misleading nor does it justify his failure to explain his intended "follow-on" investments to his potential investors. Moreover, the evidence at trial showed that SFPEF II's reaching the 75 percent goal was highly unlikely, particularly since Silver spent, in 1986, such a small percentage of the Fund's capital on health-care investments.

■ In the opinion of the Court, the circumstantial evidence of Silver's intent to defraud, or "scienter", was overwhelming. Such evidence is sufficient to demonstrate fraudulent intent. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 692 n. 30, 74 L.Ed.2d 548 (1983); *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 10–11, 5 L.Ed.2d 20 (1960).

Silver had several clear motives to defraud his investors. He had ownership and management interests in the success of Fund I companies, particularly Pathfinder and Avant–Garde/FASCO, he had personally guaranteed approximately $1.5 million in Fund I company obligations, and he needed Fund I to improve financially or he would have been unable to raise the remainder of the Fund II capital, causing his house of cards to collapse, which it did, harming Silver's most valuable asset, his reputation as a top venture capitalist.

At the time Silver was organizing the Fund, he had already told Pathfinder, Avant–Garde/FASCO and Cipherlink, computer companies, that the second Fund would bail them out. He then sought funds from several investors that had refused to invest in Fund I or had invested in Fund I and disliked the investment. Silver never told these investors of his immediate intentions.

Finally, Silver used SFPEF II's funds for his own benefit. Of the approximately $7.13 million originally collected by the Fund, approximately 5.5 million was directed to the benefit of Silver, ADSP, ADSA, SFPEF I, and SFPEF I companies. Such evidence is probative of fraudulent intent. *See United States v. Boone*, 951 F.2d 1526, 1537 (9th Cir.1991).

The Court finds that Silver's misrepresentations and omissions in his sales of limited partnership interests caused each investor's loss of capital contributed before the receiver was appointed, in Lincoln's case, $500,000.

■ To prove causation, a plaintiff must show both "transaction causation" and "loss causation". *In re VMS Secs. Litig.*, 752 F.Supp. at 1398 (citing *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988)). To show "transaction causation", a plaintiff must show that it would not have purchased the security at issue had the defendant made truthful statements at the time of sale. See *id.* at 1398–99. Lincoln has satisfied this requirement. Lincoln had previously declined to invest in Fund I; it, Raybank, Jefferson–Pilot, and Woodmen all invested in Fund II because it was to invest in the health care industry, not the computer industry.

■ To show "loss causation", a plaintiff must show that it would not have suffered a loss if the facts were as it believed

them to be at the time it purchased its security. In the opinion of the Court, Lincoln has shown that it would not have lost $500,000 and the other investors would not have lost their capital investments had Silver invested seventy-five percent of those funds in the health-care industry and had he not engaged in gross mismanagement. *Compare, e.g., In re VMS Secs. Litig.,* 752 F.Supp. at 1399 *with Bastian v. Petren Resources Corp.,* 892 F.2d 680 (7th Cir.), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990). But for Silver's wrongdoing, the limited partners would not have lost their capital contributions. *See Bastian,* 892 F.2d at 685.

Accordingly, the Court finds that Silver committed securities fraud by selling a limited partnership interest to Lincoln, and by selling such an interest to Raybank, to Jefferson–Pilot, and to Woodmen.

### *3. The Pattern Requirement*

■ Having determined that Silver committed numerous acts of mail and wire fraud and multiple acts of bank and securities fraud, the Court now turns to the most difficult, and most often dispositive, issue in civil RICO litigation: determining whether the defendant's multiple predicate acts constitute a "pattern of racketeering activity" as defined under 18 U.S.C. § 1961(5).

Section 1961(5) indicates that a "pattern of racketeering activity" requires at least two predicate acts of racketeering activity within ten years. However, the commission of two predicate acts is necessary, but not always sufficient, to demonstrate a pattern. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). The courts must thus determine when two or more predicate acts are a pattern and when they are not. In this Circuit, the Courts are guided in this task primarily by the progeny of three cases: *Sedima, S.P.R.L. v. Imrex Co., Morgan v. Bank of Waukegan,* 804 F.2d 970 (7th Cir.1986), and *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

In the *Sedima* case, the Supreme Court held that civil RICO was not limited to use against individuals and entities already having a criminal conviction, 473 U.S. at 493, 105 S.Ct. at 3283, and that it did not require proof of a special "racketeering injury", 473 U.S. at 495, 105 S.Ct. at 3284. The *Sedima* decision acknowledged concern that the use of civil RICO had outgrown its original conception and that the statute was used more against "respected business" rather than against "the archetypal, intimidating mobster." 473 U.S. at 498–500, 105 S.Ct. at 3286–87. The Court noted that this defect, if such, must be corrected by Congress, not the judiciary.

However, the *Sedima* decision, in a footnote, planted the seeds by which subsequent cases sought to limit the broad use of civil RICO. In its fourteenth footnote, the *Sedima* majority stated that RICO activity, to satisfy the pattern requirement, may not be sporadic, it requires "the threat of continuing activity." *Id.* at 496 n. 14, 105 S.Ct. at 3285 n. 14. The Court added the "continuity plus relationship" of acts of "racketeering activity" combine to produce a pattern. *Id.*

In *Morgan v. Bank of Waukegan* the Seventh Circuit interpreted the "continuity plus relationship" language of *Sedima* to permit the demonstration of a "pattern" despite the existence of but one scheme to defraud. 804 F.2d at 975. Holding that a multiple scheme requirement focuses too heavily on "continuity" and not enough on "relationship", the *Morgan* decision adopted a multiple factor test to determine if "racketeering activity" is sufficiently "continuous" to constitute a pattern. The *Morgan* factors are: (1) the number and variety of predicate acts, (2) the length of time over which the predicate acts are committed, (3) the number of victims, (4) the presence of separate schemes, and (5) the occurrence of distinct injuries. *Id.*

Applying its test, the *Morgan* case reversed the district court's dismissal of plaintiffs' RICO complaint. There, two plaintiffs, a couple, claimed that the defendants, and bank and others, committed multiple acts of mail fraud in furtherance of a single scheme to defraud via two fraudulent foreclosure sales and a fraudulent loan transaction. The district court dismissed the case but the Sev-

enth Circuit reversed, stating that the defendants had a single scheme to defraud that lasted over four years and that was carried out through distinct wrongful acts. *See id.* at 976.

In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court, like the *Morgan* panel, rejected a proposed "multiple scheme" requirement to civil RICO claims. In so doing, the Court attempted to further explain the "continuity plus relationship" language of *Sedima*. The practical result of this discussion has been the creation of a somewhat categorical approach to "continuity", the more difficult of the two concepts to apply. The *H.J.* Court explained that "continuity" "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." 492 U.S. at 241, 109 S.Ct. at 2902.

■ Closed-ended continuity may be demonstrated by "proving a series of related predicates extending over a substantial period of time." *Id.* at 242, 109 S.Ct. at 2902.

■ In contrast, open-ended continuity need not last over a substantial period of time. It is established (1) if "the related predicates themselves involve a distinct threat of long-term racketeering activity"; (2) if "the predicate acts or offenses are part of an ongoing entity's regular way of doing business", that is, "where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes"; and (3) if the "predicates are a regular way of conducting [the] defendant's ongoing legitimate business." *Id.* at 242–43, 109 S.Ct. at 2902.

After *H.J.*, the Seventh Circuit retained the *Morgan* test, but refocused it toward achieving a "natural and common sense result." *420 East Ohio Ltd. Partnership v. Cocose*, 980 F.2d 1122, 1124 (7th Cir.1992) (citing *United States Textiles, Inc. v. Anheuser–Busch Cos.*, 911 F.2d 1261, 1267 (7th Cir.1990)). Recent Seventh Circuit precedent shows that the *Morgan* factors are predominantly used in evaluating asserted closed-ended continuity. *See Vicom, Inc. v. Harbridge Merchant Servs. Inc.*, 20 F.3d 771 (7th Cir.1994) (applying *Morgan* analysis to rule out closed-ended continuity then considering factual allegations as a whole in evaluating open-ended arguments); *McDonald v. Schencker*, 18 F.3d 491, 497–98 (7th Cir.1994) (same). However, in the opinion of the Court, the *Morgan* factors remain applicable to assertions of both open-ended and closed-ended continuity. In addition, because *Morgan* is consistent with *H.J.*, the pre–*H.J.* cases in this Circuit remain as persuasive authority. *See McDonald*, 18 F.3d at 498 (distinguishing pre–*H.J.* authority); *Olive Can Co. v. Martin*, 906 F.2d 1147, 1151, 1151 n. 2, ·1152 (7th Cir.1990) (same).

Here, Lincoln, for SFPEF II and for itself, argues that Silver engaged in a pattern of racketeering activity by using fraud as a regular way of conducting his otherwise legitimate business. The Court agrees, despite the fact that the Seventh Circuit has found "continuity" in a civil RICO case but once since the *H.J.* case. *See Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1295 (7th Cir.1992) (noting that it was a different case from all previous Seventh Circuit decisions interpreting *H.J.*). In the opinion of the Court, a finding of a pattern of racketeering activity is dictated by the *Morgan* factors, pre–*H.J.* case law, and post–*H.J.* case law.

The Court first notes that the racketeering activity in this case, the predicate acts, are related. The mail, wire, bank, and securities fraud conducted by Silver was all related to buttressing sick Fund I companies and diverting funds to Silver and his related entities.

The *Morgan* factors support a finding of a pattern. Plaintiff proved a large number of predicate acts through mail and wire fraud. This quantity of mail and wire fraud predicate acts, however, has no bearing on the issue of continuity. *Shields*, 975 F.2d at 1295; *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1278–79 (7th Cir.1989) Instead, with respect to mail and wire fraud, the Court must look to the number of distinct fraudulent transactions furthered by the mail and wire fraud. Here, Silver supported several

fraudulent transactions through the mails and wires. He also used the mails to prepare fraudulent schemes that fell through. In addition, Plaintiff proved two distinct acts of bank fraud, and four distinct acts of wire fraud. Plaintiff has thus made a showing of multiple and different predicate acts. These acts were committed over a period of almost two years, from April 1985 through February 1987. There were multiple victims. The investors, the banks, and IBM. And, there were distinct injuries, loss of capital for the investors, decreased collateral value and increased risk of liability for the banks, and increased risk for IBM. Finally, there were multiple, but related, schemes: a scheme to defraud investors, a scheme to divert funds to Silver and his entities, a scheme to defraud banks, a scheme to defraud IBM, and a scheme to defraud potential investors in FASCO.

In the opinion of the Court, the Court's finding of a pattern is supported by the pre–*H.J.* case *Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271 (7th Cir.1989). There, the Seventh Circuit affirmed a jury verdict finding that the defendants had engaged in a pattern of racketeering activity through a multiple but related theft schemes which victimized four companies, lasted the short period of four months, and which involved multiple acts of wire fraud, a bankruptcy fraud, and arson.

The four *Ashland Oil* plaintiffs supplied petroleum products to Arnett Oil, a wholesaler. The Arnett brothers fraudulently induced the plaintiffs to extend them credit, stole large quantities of the plaintiffs' oil, fraudulently diverted funds (like Silver), committed bankruptcy fraud, and burned their records just before the bankruptcy trustee requested them. Noting the multiple victims and variety of predicate acts, the Seventh Circuit affirmed the jury's verdict, despite the fact that the predicate acts took place over just four months. *Ashland Oil, Inc. v. Arnett,* 875 F.2d at 1279.

Silver, like the Arnett brothers, diverted funds to himself at the expense of multiple investors. He used a variety of predicate acts, caused different injuries and conducted his activities over a longer period of time. Like the conduct of the Arnett brothers,

Silver's activity was part of his normal means of conducting business and projected a risk of continuing into the future. *See Olive Can Co. v. Martin,* 906 F.2d at 1151–52 (describing the *Ashland Oil* case). Several other pre–*H.J.* cases support the Court's finding. *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1303–05 (7th Cir.1987) (finding a pattern from nineteen separate acts of mail and wire fraud lasting seven months and defrauding, but repeatedly, a single victim), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989); *United States v. Horak,* 833 F.2d 1235, 1239–41 (7th Cir.1987) (upholding finding of a pattern beyond a reasonable doubt for three separate bribes); *Appley v. West,* 832 F.2d 1021, 1027–28 (7th Cir.1987) (holding that two acts of mail fraud within five months constituted a pattern); *United States v. Garver,* 809 F.2d 1291 (7th Cir.1987) (stating that a pattern was "obvious" with four separate instances of mail fraud); *Illinois Dep't of Revenue v. Phillips,* 771 F.2d 312, 316–17 (7th Cir.1985) (finding that the government stated a claim for civil RICO for repeated mailing of false tax returns, a mail fraud violation). Here, as in many of those cases, the fraudulent activity would have continued indefinitely, or at least for ten years, until detected. *See Marks v. Pannell Kerr Forster,* 811 F.2d 1108, 1112 (7th Cir.1987) (distinguishing *Phillips* from *Lipin Enterprises Inc. v. Lee,* 803 F.2d 322 (7th Cir. 1986)).

After *H.J.* the Seventh Circuit has insisted that a pattern of RICO activity demonstrate "the sort of long-term criminal activity that carries some quantum of threat to society ..." *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1025 (7th Cir.1992) (Flaum, J. for the unanimous panel). In the opinion of the Court, the requisite distinction between "garden variety" fraud and fraud constituting a "quantum of threat to society", is illustrated by the Court's discussion in *Olive Can Co. v. Martin,* 906 F.2d 1147, 1151–52 (7th Cir. 1990).

In *Martin,* Judge Flaum, the author of *Midwest Grinding,* distinguished that case, a post–*H.J.* case, from *Ashland Oil.* The plaintiffs in *Martin* were six creditors of the Delicious Cook Company. They claimed that

the defendants, Jacob and Jonathan Martin and the cookie company, violated RICO by setting up a sham corporation to divert to Jacob Martin money that would have been available to satisfy the company's obligations. At a time when the cookie company needed capital but was in debt, the Martins set up a corporation that purchased the cookie company's inventory with funds advanced by Jacob Martin and secured by the new corporation's assets. The new corporation then sold the inventory and advanced the receipts to Martin. After setting up the new corporation, the Martins purchased merchandise on credit from the plaintiffs, who were not told of the new corporation or its senior security interest. When the old corporation failed, the creditors sued, claiming that the Martins had engaged in a pattern of RICO activity much like the Arnett brothers in *Ashland Oil.* The district court granted the Martins' motion for summary judgment on the plaintiffs' RICO claims. The Seventh Circuit affirmed.

In upholding the decision of the district court, the Seventh Circuit distinguished *Ashland Oil* on two grounds: (1) the predicate acts in *Arnett,* which were not limited to mail and wire fraud like those in *Martin,* themselves were "indicative of a threat of continued activity", and (2) the frauds in *Ashland Oil,* unlike those in Martin, did not have an obvious stopping point. *Martin,* 906 F.2d at 1152.

In the opinion of the Court, this case is more like *Ashland Oil* than like *Martin.* Like the predicate acts in *Ashland Oil,* the predicate acts here are not limited to mail and wire fraud and present the threat of continued activity. And, like the schemes in *Ashland Oil,* the schemes here would have continued for a considerable period of time. Unlike in *Martin,* wherein the defendants had a "single, short-term goal" and were not in the business of theft, the Defendant here, Silver, had the long term goals of reviving Fund I companies and diverting funds to himself at the expense of his investors. While Silver cannot be said to be in the business of defrauding investors, he regularly used fraud in his business, a business that contemplated a long-term relationship between the parties. In the opinion of the

Court, such facts require a finding of a "pattern of RICO activity." The Court thus holds that Silver so conducted himself.

Lastly, the Court's holding is supported by the single post–*H.J.* case in which the Seventh Circuit found the existence of a pattern of RICO activity, *Shields Enterprises, Inc. v. First Chicago Corp.,* 975 F.2d 1290 (7th Cir. 1992). In *Shields,* the plaintiff, SEI, sued First Chicago and a First Chicago officer alleging RICO violations arising out of what the Seventh Circuit called "a familiar scenario: a business arrangement gone sour." *Id.* at 1291. SEI and two individuals, Cooper and Harris, formed a non-public corporation, CBSI, which specialized in computer billing services for the cellular telephone industry. CBSI grew to the point that it needed capital. In March 1985, First Chicago purchased 52% of CBSI's stock under an agreement contemplating approximately a seven year relationship between the parties, until 1992. At the same time, SEI, Cooper and Harris contributed their CBSI stock to a new corporation, Technology Group. The three each took a one-third share of Technology Group's stock and agreed not to sell the company's CBSI stock without their unanimous consent.

CBSI continued to grow but needed capital desperately. First Chicago thus offered to accelerate its stock purchase at a lower than average price per share, a price that SEI thought would permit First Chicago to dilute SEI equity position. SEI thus insisted that Technology Group be permitted to maintain its proportionate share. Despite first insisting that it be permitted to purchase all the additional stock, First Chicago "relented" and it and Technology Group each purchased more stock and maintained its approximate position. SEI provided the funds for Technology Group's purchase because neither Cooper nor Harris wanted to contribute more money.

Cooper, CBSI's CEO, wanted out of the company and started discussions, without First Chicago's knowledge, with Cincinnati Bell about a sale of CBSI to that company. When First Chicago found out about the negotiations it was cautious, but soon decided to agree to Cincinnati Bell's price, without shopping CBSI to any other buyers. On

April 17, 1986, SEI, Cooper, Harris, and First Chicago reached an agreement in principle with Cincinnati Bell. Each signed an Allocation Agreement setting out the distribution of the expected Cincinnati Bell payments.

Shields, of SEI, did not like the stock sale price. He offered to buy Cooper's and Harris's Technology Group stock. SEI contended that First Chicago reacted to this offer by "making a series of threats designed to dissuade Cooper and Harris from selling to SEI and to 'force' CBSI's sale to Cincinnati Bell." *Id.* at 1293. These threats were a threat to issue more stock and dilute Technology Group's interest, replace CBSI's management, and terminate an consulting contract between SEI and CBSI. In light of these threats, SEI eventually consented to the sale and made approximately $4.4 million. It sued First Chicago, however, claiming that CBSI should have been sold at a much higher price. The district court dismissed SEI's RICO claims. On appeal, the Seventh Circuit reversed.

The Seventh Circuit found that SEI had alleged two wrongful schemes: a scheme forcing a capital contribution and a scheme forcing CBSI's sale. These schemes held to be supported by three separate instances of extortion. While recognizing that two schemes does not necessarily make a pattern, the *Shields* panel held that there existed a threat of future RICO activity, despite the fact that all of the alleged racketeering took place within eight months and despite the fact that the alleged racketeering activity had a clear ending point, the sale of CBSI.

The panel reasoned that the allegations showed that whenever First Chicago was hampered by the Technology Group, it resorted to extortion. The *Shields* court held that such allegations were sufficient to show a "pattern" based on its every day meaning. *Id.* at 1296. The Court found that there existed a continuing threat of criminal activity because if the CBSI sale had not gone through, "First Chicago would have continued to use wrongful threats to force the minority shareholders to do its bidding." *Id.* Noting that the parties contemplated a long-term relationship, from 1986 through 1992,

the Court found that the threat could have lasted a "long-time", thereby concluding that the RICO "continuity" requirement was satisfied. *Id.* (citing *Ikuno v. Yip*, 912 F.2d 306, 308–09 (9th Cir.1990)).

In the opinion of the Court, Silver's "racketeering activity" far exceeded that of First Chicago in *Shields*. Silver committed more predicate acts, with a greater variety, injuring more victims differently, for a longer period of time, and with a more definite and longer contemplated future relationship.

Based on *Shields, Ashland Oil,* the discussion in *Martin,* and the *Morgan* factors, the Court finds that Silver engaged in a pattern of racketeering activity as defined under 18 U.S.C. § 1961(5). *See also, Ikuno v. Yip,* 912 F.2d at 308–09 (finding a pattern based on the contemplated continuing relationship of the parties); *A.I. Credit Corp. v. Hartford Computer Group, Inc.,* 847 F.Supp. 588, 602–04 (N.D.Ill.1994) (finding a pattern based on fraudulent loans making up a single scheme which had four victims and three distinct injuries over approximately thirteen months); *Dynabest Inc. v. Yao,* 760 F.Supp. 704, 708–11 (N.D.Ill.1991) (finding a RICO pattern based on *Morgan* where predicate acts including fraudulent solicitation of capital contributions).

Accordingly, the Court holds that Silver violated sections 1962(a), 1962(b), and 1962(c).

### 4. Damages and Distinct Injuries

■ The Court finds that Plaintiff, for SFPEF II, proved that Silver's "racketeering activity" proximately caused a loss of $7,134,596, representing the total paid-in-capital collected by SFPEF II prior to the appointment of the receiver. Of that amount, Lincoln, individually, had a loss of $500,000. Lincoln now argues that each of these losses is separately compensable as an injury to business or property under 18 U.S.C. § 1964. For this proposition, Lincoln cites two cases, *Thomasson v. Manufacturers Hanover Trust Co.,* 657 F.Supp. 448, 453 n. 4 (S.D.Tex.1987), *aff'd,* 845 F.2d 1020 (5th Cir.1988) (table), and *In re Summit Ridge Apartments, Ltd.,* 104 B.R. 405, 409 (Bankr.N.D.Ala.1989).

These cases stand for the proposition that a RICO plaintiff directly injured by RICO activity has standing to sue. It is common for shareholders, or limited partners, directly injured by RICO activity to have standing to sue where state law would ordinarily permit suit. *See Whalen v. Carter,* 954 F.2d 1087 (5th Cir.1992). The Court does not deny Plaintiff's right to sue individually for any direct injury it has suffered. However, the Court will not permit Lincoln a double recovery (and then triple that recovery on top of it). While Lincoln suffered a direct injury of $500,000, that injury is subsumed into SFPEF II's injury of $7,134,596.[7] Lincoln, for SFPEF II, is entitled to treble damages and the cost of this suit, including reasonable attorneys' fees. 18 U.S.C. § 1964(c).

Accordingly, on Counts VIII–XIII, the Court finds for the Plaintiff and against Defendant Silver. The Court awards $21,403,788 in damages. Plaintiff shall submit a detailed and documented request for attorneys' fees.

## B. SFPEF II's and Lincoln's Breach of Fiduciary Duty Claims

As an alternate theory of recovery, in counts VI and VII, Lincoln, for itself and as an assignee of SFPEF II, claims that Silver and ADSP breached their fiduciary duties to the partnership and to Silver's limited partners. The Court finds for the Plaintiff and against the Defendants on each Count.

Under New Mexico law, a partner, including a general partner of a limited partnership, owes a fiduciary duty to his partnership and his partners. *See* N.M. Stat. Ann. §§ 54–1–21, 54–2–9 (Miche 1978); *Levy v. Disharoon,* 106 N.M. 699, 749 P.2d 84, 89 (1988); *Homestake Mining Co. v. Mid–Continent Exploration Co.,* 282 F.2d 787 (10th Cir.1960). Under this requirement, "a partner is not allowed to gain any advantage over a co-partner by fraud, misrepresentation or concealment, and for any advantage so obtained he must account to the co-partner." *Levy,* 749 P.2d at 89.

A partner may breach his fiduciary duties in several ways. For example, a partner breaches his fiduciary duty by appropriating partnership funds to his own use, *Levy,* 749 P.2d at 89, or by failing to be completely honest, open, and fair in the provision of information to co-partners, *see C.B. & T. Co. v. Hefner,* 98 N.M. 594, 651 P.2d 1029, 1035–36 (Ct.App.) (citing *Rogers v. Stacy,* 63 N.M. 317, 318 P.2d 1116 (1957)), *cert. denied,* 98 N.M. 590, 651 P.2d 636 (1982). When a partner having superior knowledge stands to benefit from a transaction with his partners, or partnership, equity "raises a presumption" against the validity of that transaction, requiring the partner with superior knowledge to affirmatively overcome that presumption. *See Cave v. Cave,* 81 N.M. 797, 474 P.2d 480, 484 (1970). In the opinion of the Court, Silver committed several breaches of his fiduciary duties.

Silver's self-dealing was extensive. Of the more than $7.1 million collected by SFPEF II in capital calls, Silver lent, invested, or transferred approximately $5.5 million to himself, SFPEF I, ADSP, ADSA, and SFPEF I portfolio companies. Silver invested large quantities of money, at one time $2.5 million, in venture capital funds he controlled, despite two express provisions in the LPA limiting that power. In addition, Silver invested more than $700,000 in SFPEF I companies after directly being told not to do so by his partners. Silver transferred more than $333,000 to his own account and, mistake or not, kept more than $16,000 of it. Further, Silver permitted SFPEF II funds, $9,500, to be used to pay off taxes on his personal residence. In addition, Silver made large "loans" to his entities interest-free.

Silver co-mingled funds of the various entities he controlled, he caused SFPEF II to guarantee loans to SFPEF I entities, and he

---

7. Similarly, in the Court's subsequent discussion of the remaining Counts, the Court considers these Counts, and the remedies awarded thereunder, excepting a punitive damage award, to be alternative theories of recovery. *See LaSalle Bank Lake View v. Seguban,* 851 F.Supp. 336, 338 n. 1 (N.D.Ill.1994), *rev'd on other grounds,* 54 F.3d 387 (7th Cir.1995); *Bragado v. City of Zion/Police Dep't,* 839 F.Supp. 551, 555 (N.D.Ill. 1993). Thus, Plaintiff may not recover separately for each theory, although the Court finds that each cause of action independently supports the damages discussed.

used SFPEF II's assets to obtain loans for ADSA.

Although Silver attributes much of his self-dealing as payment for the making or selling of investments, the evidence is undisputed that, at the end of December 1985, SFPEF II had $2.5 million in receivables from SFPEF I, more than one million of which remains outstanding. The evidence at trial showed that SFPEF II transferred $2.3 million to ADSP and $284,000 to ADSA, in direct violation of the LPA's limitations on Silver's investments in his own partnerships and on SFPEF II's investing more than $500,000 in venture capital funds.

Finally, the evidence showed that Silver kept investing in Pathfinder to protect his own interests and not those of his investors. While the Court may not substitute its business judgment for that of Silver, the evidence at trial showed that no reasonably prudent investor would have continued to fund Pathfinder at the levels Silver did. Silver was under a fiduciary duty to make reasonably prudent investments. *See Kolentus v. Avco Corp.*, 798 F.2d 949, 966 (7th Cir.1986), *cert. denied*, 479 U.S. 1032, 107 S.Ct. 878, 93 L.Ed.2d 832 (1987). Silver's continued investment in Pathfinder was a clear breach of this duty, particularly since his investors had directed him not to do so.

Under N.M. Stat. Ann. § 54–1–21, SFPEF II is entitled to any benefit or profit had by Silver at its expense. Although Lincoln has not detailed these damages, or explained what part of its loss is attributable to Silver's fiduciary breach, the Court need not inquire further into the matter at this time, because damages under Counts VI and VII are merely alternative theories of relief. Because Lincoln had already been awarded its actual damages, trebled, further inquiry into actual damages here is not necessary. If necessary at a later date, Lincoln may submit supplemental materials explaining its, and SFPEF II's, actual damages under Counts VI and VII.

 Nevertheless, the Court's inquiry here is not over. Under New Mexico law, punitive damages may be awarded for a breach of fiduciary duty. *Levy v. Disharoon*, 106 N.M. 699, 749 P.2d 84, 90 (1988). Such

an award is justified where a partner who breached his fiduciary duties engaged in malicious, intentional, fraudulent, oppressive or reckless disregard of his partner's rights. *Bassett v. Bassett*, 110 N.M. 559, 798 P.2d 160, 165 (1990) (upholding punitive damage award, citing *Levy*); *see also Romero v. Mervyn's*, 109 N.M. 249, 784 P.2d 992, 998 (1989) (stating requisite showing for punitive damages).

 In the opinion of the Court, an award of punitive damages is appropriate in this case. Silver exhibited an intentional and fraudulent disregard for his partner's rights. The Court therefore awards SFPEF II $1,000,000 in punitive damages, in order to punish Silver for his extraordinary misconduct, and to serve as an example or warning to others not to engage in such conduct.

Accordingly, the Court finds for the Plaintiff and against the Defendants on Counts VI and VII, and awards actual and punitive damages. Based on the facts and law, as set forth in this opinion, the Court enters judgment, for actual damages suffered, in the amount of $7,134,596, and punitive damages in the amount of $1,000,000.

### C. Lincoln's Rule 10b–5 Claim

As an alternative theory of relief, in Count III, Lincoln, in its individual capacity only, claims that Silver and ADSP violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated under section 10(b). For the reasons stated in the Court's discussion of Lincoln's RICO claims, the Court finds for the Plaintiff and against the Defendants on Count III. As indicated, Lincoln's actual damages proximately caused were $500,000, representing the amount contributed by Lincoln to SFPEF II in response to the Fund's first capital call.

 Lincoln claims that it is entitled to prejudgment interest. This is a matter within the Court's sound discretion. *Michaels v. Michaels*, 767 F.2d 1185, 1204 (7th Cir.1985) (affirming an award of prejudgment interest in a Rule 10b–5 case), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986); *see also Commercial Union Assurance Co. v.*

*Milken,* 17 F.3d 608, 613 (2d Cir.) (discussing prejudgment interest in a Rule 10b–5 cases involving limited partnerships), *cert. denied,* 513 U.S. 873, 115 S.Ct. 198, 130 L.Ed.2d 130 (1994). Such awards are for compensation, not punishment. *See Anixter v. Home–Stake Prod. Co.,* 977 F.2d 1549, 1554 (10th Cir. 1992), *cert. denied,* 507 U.S. 1029, 113 S.Ct. 1842, 123 L.Ed.2d 467 (1983). The decision to award prejudgment interest requires balancing the equities of the parties. *Michaels,* 767 F.2d at 1204. Here, the equities clearly favor the Plaintiff. The Court, however, is unable to calculate the appropriate amount of prejudgment interest at this time. Thus, the Court requests a memorandum from each party which calculates the appropriate level of prejudgment interest to be awarded.

Accordingly, judgment for the Plaintiff on Count III.

### D. Lincoln's Section 12(2) Claim

■ In an additional alternate theory of recovery, in Count I, Lincoln, individually, claims that Silver and ADSP violated section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2). That section imposes liability on any person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements . . . not misleading." 15 U.S.C. § 77*l*(2).

The Court finds that Silver violated this section by making untrue statements in the Confidential Offering Memorandum, a prospectus. *Cf. Ambrosino v. Rodman & Renshaw, Inc.,* 972 F.2d 776, 784–85 (7th Cir. 1992) (applying section 12(2) to a private offering of limited partnership interests); *Spatz v. Borenstein,* 513 F.Supp. 571, 577 & n. 2 (N.D.Ill.1981) (noting that antifraud provisions of the securities laws apply to unregistered securities).

Under Section 12(2), Plaintiff's damages are its $500,000 contribution to SFPEF II plus interest. The Court will rule on the question of the appropriate award of interest as soon as possible after receiving the supplemental submissions of the parties.

Accordingly, judgment for the Plaintiff on Count I.

### E. Lincoln's Claim under the Illinois Securities Law of 1953

■ In Count IV, an alternate theory of recovery, Lincoln, individually, claims that Silver and ADSP violated section 5/12 of the Illinois Securities Law of 1953, S.H.A. 815 ILCS 5/12 (1993). The elements of this claim are satisfied by either the elements of a Rule 10b–5 violation, *see Branch–Hess Vending Servs. Employees' Pension Trust v. Guebert,* 751 F.Supp. 1333, 1342 (C.D.Ill.1990), or by the elements of a section 12(2) violation, *see Spatz,* 513 F.Supp. at 577 n. 7 (N.D.Ill. 1981). Either way, the statute is here satisfied.

Under S.H.A. 815 ILCS 5/13 (1993), Plaintiff's damages are $500,000 plus interest and attorneys' fees. Again, the amount of prejudgment interest will be determined with the assistance of the memoranda submitted by the parties. The amount of attorneys' fees to be awarded will also be determined by the Court with the assistance of the supplemental material to be submitted, including supporting affidavits.

Accordingly, judgment for Plaintiff on Count IV.

### F. Lincoln's Fraud Claim

■ In Count XXI, Lincoln alleges a claim against Silver for fraud. This analysis is governed by the Court's Rule 10b–5 analysis. The Court finds for the Plaintiff. Plaintiff's damages are the identical $500,000 awarded with respect to Counts I, III and IV, plus prejudgment interest.

[27, 28] By proving common law fraud, a plaintiff may be entitled to punitive damages. *See Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.,* 113 N.M. 9, 820 P.2d 1323, 1328–29 (1991). In the opinion of the Court, an additional award of punitive damages for Silver's fraud is warranted. The Court awards an additional $500,000 in punitive damages in order to punish Silver for his extraordinary misconduct, and to serve as an example or warning to others not to engage in such conduct.

### G. Summary

The Court finds for the Plaintiff and against the Defendants on all Counts. The Plaintiff is hereby awarded $22,903,788 in

damages, representing actual damages of $7,134,596, trebled, plus $1.5 million in punitive damages. Since Plaintiff is entitled to only one recovery of actual damages, even though Plaintiff has proved that it is entitled to recover under multiple causes of action, the actual damages calculated by the Court represent a single recovery of actual damages. The Plaintiff is also entitled to its reasonable costs and attorneys' fees, pursuant to 18 U.S.C. § 1964(c) and 815 ILCS 5/13, for which Plaintiff shall submit a detailed and documented request.

## IV.  CONCLUSION

The Court finds for the Plaintiff and against the Defendants on all Counts. The Plaintiff is hereby awarded $22,903,788 plus reasonable attorneys' fees. Plaintiff shall submit its request for interest and fees, supported by sworn affidavits, and a draft judgment order within three weeks of the date of this order. Defendants may respond, if they wish, within two weeks thereafter. The Court will promptly rule by mail, entering final judgment in this case.